This case arises out of an appeal of an award of child custody. Kimberly Akers Kelley (hereinafter "Kelley") and Bud Junior Akers IV (hereinafter "Akers") were divorced in 1998. Originally, custody of their one minor child, T.A., was granted to Kelley; however, on Akers's petition, the trial court subsequently awarded custody to Akers. Kelley appeals from the judgment modifying the custody order. We reverse and remand.
The sole question here is whether the trial court erred in awarding custody of T.A. to Akers based on the problems Akers claimed the parties were having regarding visitation. Specifically, Kelley contends that the trial court's decision to award custody to Akers was plainly and palpably wrong because, she argues, the alleged problems between the parties, standing alone, are not enough to warrant an alteration of the custodial arrangement. The trial court received ore tenus testimony from Kelley, Akers, several family members and friends, T.A.'s counselors, and police officers who had supervised visitation exchanges. That testimony was largely conflicting.
Akers told the trial court about the circumstances of his visitation with T.A., explaining that he often could not be present to personally pick her up for, and drop her off from, visitation, because of his work schedule. That schedule, he said, required him to work at least 6 days a week and usually 12 hours a day. Akers testified that on several occasions Kelley did not let him have his court-ordered visitation with T.A. On T.A.'s birthday, Akers drove from Billingsley to Greenville to see his daughter, but Kelley never showed up with T.A. and never gave him any explanation for their absence. Kelley also never showed up to transfer T.A. to Akers on Father's Day as Akers said had been ordered by the trial court. Again, he said, Kelley gave Akers no explanation for their absence. However, Akers admitted on cross-examination that the visitation schedule ordered by the trial court did not include provisions for Akers to have visitation on T.A.'s birthday or Father's Day and that the arrangement he and Kelley had for visitation on those days constituted a private agreement. Akers also testified concerning a Thanksgiving visitation, during the exchange for which Kelley tore up the document setting out the visitation agreement. However, he later admitted on cross-examination that despite Kelley's having torn up their private agreement for *Page 823 
Thanksgiving visitation, the visitation schedule ordered by the trial court — which did not include provisions for Thanksgiving — was complied with. Akers stated that during a scheduled Christmas visitation he was never able to give T.A. her medicine because her prescription needed refilling and the label on the bottle of medicine that Kelley had given to Akers had been tampered with to such a degree that the pharmacy would not refill the prescription unless T.A. saw another physician. Akers stated that on other occasions, Kelley neglected to give him T.A.'s allergy medication when she dropped T.A. off for visitation. He also testified that once during a visit he discovered that T.A. was suffering from pinworms. Only upon contacting T.A.'s aunt, Akers says, did he learn that Kelley knew about her daughter's condition, for which Kelley claimed that T.A. had been medically treated. On cross-examination, Akers admitted that, although he missed several scheduled weekend visits with T.A. because she had been ill, Kelley had worked with him to compensate for that lost time by arranging visitation on other weekends.
Akers accused Kelley of trying to bribe T.A. not to visit Akers, by offering presents. He also insinuated that T.A. had been mistreated by Kelley's current husband while T.A. was in Kelley's custody. He stated that on one occasion when T.A. arrived for her visit with Akers, she was wearing makeup that appeared to camouflage fingerprint marks on her cheeks. Akers testified that on some occasions he had been unable to contact Kelley and T.A. because he does not have their telephone number and for a while had not had their address. He explained that he eventually discovered that the telephone number was listed under T.A.'s name, but that it was unpublished. He said the only reason he eventually discovered the number was that once when T.A. called him he was able to use a call-tracing service to learn the telephone number of the location from where she was calling. Akers also explained that he discovered Kelley and T.A.'s address only because as he and T.A. were out riding around one day, T.A. recognized her mother's residence and Akers read the address on the mailbox.
Akers testified that he believed that Kelley was "continuously putting stumbling blocks" in the way of his relationship with T.A. Akers expressed the opinion that T.A. would be better off in his custody than in Kelley's and further stated that if custody was granted to him, then, he would encourage visitation with Kelley. However, he admitted on cross-examination that if custody were granted to him, then, because of his work schedule, his current wife — rather than Akers, himself — would be the person primarily caring for T.A.
Akers's current wife, Leighann, testified that with one exception, the visitation exchanges have always presented problems. She told the trial court of one occasion when she and her son had to wait five hours for Kelley to bring T.A. for visitation. She said that on another occasion when the Akerses returned T.A. from visitation she was wearing an outfit that the Akerses had purchased; Leighann said that Kelley pulled the ribbon out of T.A.'s hair, threw it down in the parking lot and told T.A. that she would never see that outfit again. Leighann stated that T.A. does well on her visits with Akers and that Leighann and T.A. get along well. She stated that she and Akers were willing to take custody of T.A. and to include her as a member of their household.
Kelley testified that she did not feel that she was interfering with Akers's visitation with T.A. and that the visitation exchanges usually ran smoothly. Kelley stated that the trial court had ordered her to provide *Page 824 
Akers with the unlisted telephone number for her previous residence. However, she admitted on cross-examination that she had since moved and had not provided Akers with the telephone number for her current residence; that number was also unlisted and had been obtained in T.A.'s name. Kelley explained to the trial court that she did not know that Akers wanted visitation with T.A. on Father's Day or on T.A.'s birthday, but that on one occasion she had allowed additional visitation that the court had not ordered. The record shows the following colloquy:
 "[Akers's trial counsel]: And you received this letter from [Akers], did you not, concerning his summer visitation?
"[Kelley]: Correct.
 "[Akers's trial counsel]: Isn't it true that you told [Akers] that you didn't get this letter in time and he wasn't going to get [T.A.]?
". . . .
"[Kelley]: No, ma'am, I did not.
"[Akers's trial counsel]: You never told him that?
"[Kelley]: No, ma'am.
 "[Akers's trial counsel]: But you never replied to that letter, is that correct?
"[Kelley]: No, ma'am."
(R. 170-71.) Our review of the record indicates that this passage fairly typically represents the sort of legal wrangling with which Kelley addressed both Akers and the trial court. This may explain why the trial court thought it necessary to move the child's custody to Akers.
Kelley admitted that although she knew how to reach Akers by telephone, she had not contacted him to tell him about T.A.'s pinworms. When asked on cross-examination why she did not tell Leighann about T.A.'s health problems when she dropped T.A. off for Akers's visit, Kelley said that Leighann did not give her an opportunity to tell her. She also testified that once when T.A. was suffering from pinkeye she tried to inform Akers about how to care for her, but that he refused to listen to her instructions, took T.A.'s medicine, and quickly departed with T.A. Kelley stated that although T.A. takes allergy medication on a regular basis, she has only once sent medicine (for the pinkeye condition) along with T.A. on her visits with Akers. Kelley said that she had never sent the allergy medication along with T.A. to Akers because, she said, T.A. takes that medication only during the week and most of Akers's visits take place on weekends. Furthermore, Kelley testified that she had tried to give Akers receipts for T.A.'s medications so that he could reimburse her for her expenses, but she alleged that he would not accept the receipts. When questioned about whether she had complied with a court order to provide Akers with the results of T.A.'s allergy reports, Kelley said that she had never received a copy of that order.
A police officer who was present at several visitation exchanges between Kelley and Akers testified that on the occasion of the Thanksgiving visitation when T.A. was supposed to visit Akers, Kelley decided not to allow T.A. to go with Akers and tore up the Thanksgiving visitation agreement; Akers made a complaint to the police officer regarding Kelley's current husband, saying he had no driver's license, despite the fact that he was sitting behind the steering wheel of Kelley's car during the visitation exchange. Despite the specific facts of the Thanksgiving visitation, the police officer characterized the visitation exchanges that he had witnessed as generally running smoothly. Another police officer who had witnessed several of the exchanges testified that on one occasion when Kelley did not show up with T.A. for the visitation with Akers, the police officer *Page 825 
had to contact Kelley's attorney to get him to persuade her to bring T.A. to Akers. The police officer stated that Kelley refused to allow T.A. to visit with her father because she did not want to hand T.A. over to Leighann, with whom she said T.A. was reluctant to go. Kelley eventually complied, two hours later, delivering T.A. to Leighann for T.A.'s arranged visit with her father.
One of T.A.'s counselors testified that T.A. had told her that when she was visiting her mother she missed her father, and that when she was visiting her father she missed her mother; the counselor also said T.A. had said it made her sad that her father did not personally pick her up for, or return her from, visitation and that it made her sad that her parents no longer lived together. Her counselors diagnosed T.A. as suffering from adjustment disorder with mixed disturbance of emotional conduct and anxiety. One counselor surmised that T.A.'s emotional problems occurred because of the stress produced from the visitation schedule. That same counselor testified that she had observed T.A. interacting with Kelley while waiting for T.A.'s counseling appointment and that from her vantage point it appeared that T.A. and her mother have a close relationship and that Kelley handles her daughter in an appropriate manner. That counselor also said she believed that if T.A. were moved out of town from the residence she had at that time with Kelley, the move would disrupt T.A.'s emotional balance, because, she said, T.A. and Kelley had a close relationship and a stability in their living conditions. T.A.'s teacher testified that Kelley appears to have a loving, protective relationship with T.A.
Kelley's current father-in-law testified that the visitation exchanges he had witnessed had occurred without incident and that T.A. has a close relationship with her mother and her stepfather (the witness's son). A family friend who had witnessed several of the visitation exchanges stated that most of them had gone smoothly, but that there had been a few conflicts between the parties. Kelley's sister, aunt, and mother all testified that Kelley has a close relationship with T.A. Kelley's great-aunt stated that Kelley and T.A. appear to have a close relationship and that she had never seen anything that would lead her to believe Kelley did not properly care for T.A. Although they could not speak to the current state of the relationship between Akers and T.A., the husband of Kelley's great-aunt; another great-aunt; and Kelley's mother all testified that during the time of Kelley and Akers's marriage Akers was a good father to T.A.
Despite the conflicting evidence, the trial court granted Akers's petition to modify and moved the custody of T.A. from Kelley to Akers. The trial court's order granting Akers's petition states, in pertinent part:
 "Based on the testimony and evidence presented in open court, the Court is of the opinion that there exists a material change in the circumstances of the parties which justifies a change in the custody and visitation provision of the . . . former decree and that the material benefits of the change will outweigh the disruption caused by the change in custody ordered herein. This Court is particularly concerned that [Kelley] though showing some conformity to the orders of this Court that [has] not been shown by her in the past continues to fight to see how little she can do by way of cooperating with [Akers] in exercising his rights to custody and participation in the upbringing of his child. The Court is satisfied that such an attitude will be detrimental to the child's development and is sufficient reason, if there were no others before the Court, to authorize *Page 826 
and justify the change herein provided. There are, however, other factors in [Akers]'s favor based on the evidence in this hearing and in previous hearings."
(C. 159-160.) (Emphasis added.)
This case is similar in many respects to Vick v. Vick, 688 So.2d 852
(Ala.Civ.App. 1997), in which this Court reversed the trial court's order granting the father's petition to modify the custody arrangement. The trial court had granted the petition on the grounds that the mother had contemptuously interfered with the exercise of the father's rights to visitation with the children. Specifically, this Court stated:
 "The judgment of a trial court based on ore tenus evidence is entitled to a presumption of correctness on appeal. Hermsmeier v. McCoy, 591 So.2d 508
(Ala.Civ.App. 1991). However, that presumption can be overcome when there is an absence of material evidence to support the trial court's factual findings. Means v. Means, 512 So.2d 1386 (Ala.Civ.App. 1987). Thus, while issues concerning child custody are within the sound discretion of the trial court, that judgment will be reversed if it is so unsupported by the evidence that it is plainly and palpably wrong. Hermsmeier, supra, at 509; Glover v. Singleton, 598 So.2d 995 (Ala.Civ.App. 1992).
 "A parent seeking to modify a previous custody order bears a heavy burden of proof. The parent must prove that a material change in circumstances has occurred since the prior judgment, and that a change of custody will materially promote the child's best interest and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, 455 So.2d 863, 866
(Ala. 1984). The evidence must be so substantial as to show an obvious and overwhelming necessity for a change. Klapal v. Brannon, 610 So.2d 1167
(Ala.Civ.App. 1992).
 "The father petitioned for modification, based on his assertion that the mother refused to recognize his visitation rights, to the detriment of the children. . . . [There was no] allegation that the mother was unfit to care for the children. . . .
 ". . . The trial court . . . found that the father would be a fit and proper person to have custody of the children.
 "We are compelled to reiterate that, in matters of child custody, frequent disruptions are discouraged. McLendon, supra, at 866 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App. 1976)). This court has held that problems encountered in carrying out visitation, taken alone, are not sufficient to necessitate a change of custody. Means, supra, at 1389; Ward v. Rodenbaugh, 509 So.2d 910 (Ala.Civ.App. 1987). . . . .
 "Our review of the record leads us to conclude that the evidence does not support the trial court's decision to transfer custody to the father. The father had the burden of proving that the wife's alleged denial of his visitation had a detrimental effect on the children; he also must prove not only that he is a fit parent, but that the positive good brought about by the transfer of custody would more than offset the disruptive effect of the change. Butts v. Startley, 600 So.2d 310 (Ala.Civ.App. 1992); Smith v. Smith, 586 So.2d 916 (Ala.Civ.App. 1991). We fail to see how the trial court could determine that the husband had met that burden without being presented more detailed evidence regarding the living situation available with the father and the present conditions in the mother's home. *Page 827 
 "The evidence presented by the father's witnesses disclosed nothing more than that the father was denied visitation. . . . Because the evidence presented by the father fell short of meeting his stringent burden of proof, we hold that the trial court's judgment is so unsupported by material evidence as to make that judgment plainly and palpably wrong. Therefore, the judgment of the trial court is reversed.
 "In issuing this opinion, we are not suggesting that parents should be allowed to violate visitation orders or that when one parent does so the other parent should be without recourse. However, there are other, more appropriate, methods for enforcing visitation rights, such as contempt proceedings or even motions to clarify the order regarding visitation rights. Transferring custody is rarely an appropriate method of enforcing visitation rights because such changes have the effect of punishing the children for their parents' noncompliance. Transferring custody creates the very instability in the lives of the children that the McLendon standard was designed to prevent.
 "The judgment of the trial court changing custody from the mother to the father is hereby reversed and a judgment is entered restoring custody to the mother."
688 So.2d at 855-56 (emphasis added.)
The Vick case represents a situation even more egregious than the situation now before us. In Vick, the father was denied all visitation with his children; this court still considered it necessary to return custody to the mother. In the instant case, Akers's visitation privileges have only been hindered by Kelley's actions, not completely cut off. However, in Vick, this Court clearly stated that, absent any other evidence regarding the living conditions of the parents, or other proof of a material change in circumstances, an order changing custody of a child is a remedy too drastic to be used merely for demanding a parent's compliance with a trial court's order.
Each parent was able to produce numerous witnesses who testified as to a positive relationship between T.A. and that parent, as to T.A.'s mental state, and as to the situation of her living conditions with that parent; and each parent's witnesses directed a fair amount of finger-pointing at the other parent. Nonetheless, our review of the record indicates Akers did not prove a material change of circumstances sufficient to justify granting his petition to modify. Akers did not allege that Kelley is an unfit mother; other than an oblique reference to "other factors" in Akers's favor, the order granting the petition gives this Court no facts to review. Rather, it appears that the trial court granted Akers's petition because of frustration based on Kelley's hindering Akers's visitation. There are other, more acceptable methods for ensuring that Kelley complies with the court's visitation order, methods that would not disrupt T.A.'s life as detrimentally as a complete change in custody would. See generally Vick, supra. While this Court does not seek either to condone or to reward Kelley because of her actions in hindering Akers's visitation rights, we cannot overlook the fact that the trial court went too far in disciplining Kelley by changing custody to Akers. T.A.'s best interests would not be served by shifting her back and forth between her parents every time one of them violates the court order. See Vick, supra, citing Ex parte McLendon, supra. Thus, even though the court based its change of custody on ore tenus evidence, the court erred in changing custody. The record contains no substantial evidence to support factual findings *Page 828 
the court would have had to make in order to grant Akers's petition. SeeVick, supra, citing Means, supra. The trial court erred in modifying the custodial arrangement. The order changing custody to Akers is reversed.
REVERSED AND REMANDED.
Crawley, Thompson, and Murdock, JJ., concur.
Yates, P.J., concurs in the result.