CRAWLEY, Presiding Judge.
C.C.H. (“the mother”) and C.E. (“the father”) are the parents of B.E. (“the child”); the parents were never married. The child, who was born in 1993, lived with her mother until 1996 or 1997, when the father took custody of the child, apparently with the permission of the mother. The father subsequently received court-awarded custody of the child in 1998. The mother petitioned for custody in January 2005. After a trial, the juvenile court awarded custody of the child to the mother. The father appeals, arguing that the mother failed to meet the test set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984).
At trial, the mother testified that the child had told her that she wanted to live with her. She also said that the child had not been happy in the father’s custody and that, had the child been happy, she would not have sought a modification of custody. The mother explained that when the child was being returned from visitation the child cried, pulled on her hair, and begged not to go back. The mother also mentioned that the child had written letters indicating that she wished she were dead and listing ways she could kill herself; those letters were attached to the mother’s modification petition.
The mother further testified that she had visited with the child on only two occasions in 2004 when the child resided with the father’s sister in Mississippi while the father, who is in the military, was stationed in Korea: for one week in July and for one week in December. The mother stated that she was supposed to have a 30-day visit with the child in the summer of 2004 but that she had not realized that she was entitled to that amount of visitation until after she had returned the child. She indicated that she thought these two visits in 2004 were her only opportunities to visit the child; however, the father indicated that the mother had alternating weekend visitation that she had not exercised.
The mother, who had been married and divorced twice since the birth of the child, was living in a rented home with her fian-cé, D.W., and her two children from another relationship before her relationship with the father. She was not employed on the .day of the trial. According to the mother, whose last employment had been as a waitress at a Hooter’s restaurant for approximately two years, she was completing classes at a nursing home and would begin a job the following week making $6.50 to $7.00 per hour. The mother had lived in five different places in the approximately 18 months immediately preceding the trial. Because of her periods of unemployment, including the two- to three-month period before trial, the mother was $5,000 in arrears in her child-support obligation.
*936 The father testified that he is a sergeant in the United States Army; he is currently stationed at Fort Leonard Wood in Missouri.[1] From November 2003 through December 2004, the father was stationed in Korea. During that period of time, the child resided with the father’s sister in Mississippi. The father said that the mother did not seek to keep the child during this time period. The father said that the mother had not contacted the child very regularly in the years preceding 2003. He said that he had attempted to work with the mother and her family to have the child visit with the mother, especially when he was stationed at Fort Ben-ning, Georgia. The father said that the child was a good student and that she has not demonstrated any behavioral problems. When questioned about the letters the child had written, the father testified that he had not seen the letters until he was served with the mother’s petition to modify custody. The father also said that the military had counseling programs that could address any mental-health issues that might have arisen with the child and that he would seek counseling to address the content of the letters.
The child testified in camera. She testified that she wanted to live with her mother because she had never had the chance to live with her and get to know her mother and her half siblings. She also said, however, that she would like to try living in Missouri with her father. The child confessed that she wrote the letters about wishing she were dead and listing ways she could commit suicide because she was “bored” and “mad” at her father for not permitting her to go somewhere she wanted to go because she had gotten into trouble at school. The child stated that she did not mean the things that she wrote. The child also stated that she had met D.W. during Christmas visitation, that she liked him, and that she had not visited the mother in the mother’s home; however, in response to later 'questioning, the child answered in the affirmative when asked if she had been to where the mother lives. The child also answered in the affirmative when asked if she had spent “plenty of time” with the mother, despite earlier explaining that she had visited the mother for two week-long visits in 2004 and speaking to her on the phone about once a month.
The Department of Human Resources performed an evaluation on the mother’s home shortly before trial at the request of the juvenile court. The report states that the mother had an indicated report of neglect in 1990; the report does not reveal the victim of the neglect. The report indicates that the child’s mental health should be addressed based upon the letters indicating a desire to commit suicide; the report further indicated that the mother told the evaluator that she would seek help for the child. Although the home evaluator did not interview the father, the report indicated that “it may be that [the father] had not [sought help for the child].” The report concluded that
“[t]his appears to be a transitional time for [the mother]. She is beginning new employment, moving into a new residence, apparently taking sole responsibility for [her two children from another relationship] for the first time in a long time. This might not be the best time to bring [the child] into this home.”
*937 The juvenile court’s judgment concludes that the mother met the burden imposed by Ex parte McLendon. Chief among the juvenile court’s reasons for that conclusion are concerns over the child’s mental health arising, presumably, from her writing the letters indicating that she wished she were dead and listing several ways she could harm herself; the mother’s improved maturity, financial stability, and overall stability; the father’s relocation to Missouri, which, according to the juvenile court, would isolate the child from her mother, her half siblings, and her father’s family in Mississippi; and the child’s wish to live with her mother, which the juvenile court expressly gave a considerable amount of weight in light of what it considered to be the child’s maturity and intelligence.
The Ex parte McLendon standard is well-settled. A parent seeking a change in custody must establish that the change would materially promote the interests and welfare of the child and that the benefits of the change in custody would “ ‘more than offset the inherently disruptive effect caused by uprooting the child.’ ” King v. King, 521 So.2d 69, 70 (Ala.Civ.App.1988) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)). In addition, a trial court can and should consider the wishes of a child involved in a custody dispute as one of a myriad of factors when making its decision; the child’s wishes are, however, not determinative of the issue. See, generally, Hayes v. Hayes, 512 So.2d 119, 121 (Ala.Civ.App.1987); Smith v. Smith, 470 So.2d 1252, 1254 (Ala.Civ.App.1985); and Sherrod v. Sherrod, 361 So.2d 17, 19 (Ala.Civ.App.1978).
The juvenile court’s conclusion that the mother met the standard imposed by Ex parte McLendon is erroneous. The mother’s evidence demonstrated that she may well have improved her circumstances. However, improvement in the mother’s circumstances is not sufficient to meet the requirements of Ex parte McLendon. Lord v. Lord, 891 So.2d 898, 903 (Ala.Civ.App.2004); and Andrews v. Andrews, 495 So.2d 688, 690 (Ala.Civ.App.1986). The father has the presumption in his favor that custody should not be disturbed unless the inherently disruptive effect of changing custody would be offset by a material promotion of the child’s welfare by such a change in custody.
The evidence, even if it does indicate that the child is in need of mental-health counseling because of newly arisen mental-health issues, does not support a change of custody to the mother. The child has been provided a stable home by the father. The father testified that counseling would be available through the military in Missouri and that he would seek counseling to address the child’s mental health. The mother, although she indicated that she was concerned about the content of the letters, did not testify about seeking counseling for the child. Her testimony indicated that she wanted the child to be happy and that she could now provide a stable home for the child because she had improved her circumstances. None of the evidence presented established that placing the child in the mother’s custody would materially promote the child’s best interests. The child’s somewhat equivocal testimony concerning her desire to live with her mother was also insufficient to overcome the presumption in favor of the father. See Glover v. Singleton, 598 So.2d 995, 996 (Ala.Civ.App.1992) (holding that where the child simply expresses a preference for one parent in a modification proceeding requiring the application of Ex parte McLendon, such a preference, without more, is insufficient to justify a change in custody). Accordingly, we must reverse the judgment of the juvenile court and *938 remand the cause for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, J., concurs.
THOMPSON, MURDOCK, and BRYAN, JJ., concur in the result, without writing.

. Neither party cited the Alabama Parent-Child Relationship Act, codified at Ala.Code 1975, § 30-3-160 et seq., to the juvenile court. We note, however, that the Act, except for requiring that notice of any relocation be given, Ala.Code 1975, § 30-3-165(c), does not apply to an active-duty military parent relocating upon a nonvoluntary order from the government. § 30-3-162(a).