Julie P. Martin ("the mother") filed a petition for a writ of certiorari, asking this Court to review the decision of the Court of Civil Appeals upholding the decision of the Baldwin Circuit Court transferring custody of her minor child ("W.") to the child's father, John H. Martin III ("the father"). We reverse.
 I. Background
A. Facts
The father and mother were married on April 26, 1986; they separated in July 2001; they were divorced on June 20, 2003. Three children were born of the marriage: W., born February 12, 1988, and two daughters, J., born September 6, 1991, and I., born June 1, 1994. The divorce judgment awarded full custody of all three children to the mother, and the father has never sought custody of J. and I. The mother is a full-time homemaker and mother; the father is the managing director and branch manager of an investment firm in Fairhope.
In the mid-1990s W. was diagnosed with attention-deficit/hyperactivity disorder, a mathematics disorder, and significant academic fluency problems. He also suffers from emotional and behavioral problems and has been in counseling with Robert E. Colclough, a licensed professional counselor, since 1997. He has attended a private academy in Daphne and has participated in the school's learning-disabled program.
During the divorce proceedings in 2002-2003 and thereafter, W.'s problems became more severe. These problems included outbursts of rage; binge drinking; disobedience and disrespect toward his mother, including using foul language and storming out of the house when she tried to talk with him; violent actions such as the destruction of glass objects in the house and a remote control for a television; and cutting his sister's pet fish in half with a pair of scissors. He has also expressed suicidal thoughts.
According to the mother, the father refuses to discipline W., and while she had custody the father exercised visitation only sporadically. From June 2003 (the date of the divorce) until January 2004, when W. went to live with the father, W. spent only one night with the father even though the father lives only 10 miles from the mother. The mother stated that in May 2004 the father promised his daughters he would attend their dance recital; instead, on the date of the recital he went to gamble in Biloxi, Mississippi.
The mother claims the father is a habitual gambler who frequently risks large sums of money. Although he currently denies he has a gambling addiction, before the divorce he wrote several letters acknowledging that he had a gambling addiction, and at one point he voluntarily admitted himself to a facility for treatment of a gambling addiction, but he did not complete the treatment program. After the father obtained temporary custody of W. in April 2004, the mother was very concerned about W.'s lack of supervision. She hired special investigators to follow the father. The investigators testified that they followed the father for 47 days and that on 30 of those days the father drove to Biloxi to gamble and was sometimes observed in a casino for as long as 10 consecutive hours betting up to $20,000 in a game. W. admitted that while he has lived with the father, the father has often left the house on Friday and has not returned until Saturday. The father admitted that after he received temporary custody of W., he continued to go to Biloxi to gamble at least once a week and usually more. He also admitted that, in addition *Page 85 
to legal gambling, he engages in illegal gambling.
At a custody hearing on March 22, 2004, the father testified that he had recently had a "revelation" about gambling, and he vowed in court that he would never gamble again. On March 24, 2004, and on April 2, 2004, the trial court ordered the father not to gamble while W. was in his custody. However, the father continued to gamble as before, claiming that he thought the court's order meant only that he was not to gamble while W. was in his presence and that his vow never to gamble meant only that he would not gamble until after he had finished teaching a financial seminar.
The mother also claims that the father has a drinking problem. The father testified that he quit drinking in 1998. However, the private investigators who followed the father testified that they observed him drinking alcoholic beverages in Biloxi and that at that time he was not only noticeably intoxicated but also drove a vehicle in an erratic and dangerous manner; he also was stopped by an employee at one casino, who expressed concern about his ability to drive. W. testified that he has continued to drink alcohol while he has been in his father's custody. The mother believes the father will do nothing to discourage W. from drinking and that his own drinking habits send a message to W. that drinking is acceptable behavior.
The mother also claims the father is emotionally unstable. Mr. Colclough, who counseled the mother and father before their divorce, testified that the father is emotionally unstable, that he suffers from alcohol and gambling addictions, and that he has demonstrated bipolar characteristics and erratic, disoriented behavior. The mother claims the father's emotional instability is further evidenced by the father's testimony that the mother is "possessed" by demons because she attends an Anglican church, which the father believes is "a cult."
The mother has asked the father to join her and W. in further counseling with Mr. Colclough, but the father told her, "I'd rather go to a [racial epithet deleted] dog fight than to meet with Bob Colclough." The mother arranged for W. to continue counseling with Mr. Colclough, but during a session in November 2003 W. had an angry outburst in which he stated that he should be allowed to do whatever he wanted, cursed Mr. Colclough, and stormed out of the session. After that, W. refused to attend any further counseling sessions with Mr. Colclough.
The mother was then referred to Carol Maxym, Ph.D., a board-certified psychologist specializing in child psychology and the placement of troubled teens in residential treatment facilities. Dr. Maxym recommend that the mother enroll W. in the Second Nature Wilderness Program, a six-to eight-week program in Utah that provides intensive therapy to children in crisis. Dr. Maxym said that she had referred approximately 30 children to this program and that almost all of them had experienced dramatic improvement. The mother consulted Dr. Kendra LaConsay, a licensed psychologist in Daphne, and Mr. Colclough, both of whom agreed that having W. participate in the Second Nature Wilderness Program was the proper course of action. She also consulted the headmaster at the private academy W. was attending in Daphne, who assured her that he would cooperate with the Second Nature Wilderness Program and ensure that W. was able to keep up with his studies while he was in Utah. The mother sent W. to Utah to participate in the Second Nature Wilderness Nature Program on January 6, 2004. *Page 86 
B. Proceedings in the Trial Court
When the father learned that W. had been sent to Utah to participate in the Second Nature Wilderness Program, he secured an ex parte order from the Baldwin Circuit Court authorizing him to travel to Utah and bring W. back to Alabama. The father rented a private Lear Jet to travel to Utah. On January 9, 2004, a counselor for the Second Nature Wilderness Program telephoned the mother and told her that the father had appeared at the Utah site in a manic state demanding that W. be released to his custody. The following day W. was released to his father's custody. On their return flight to Alabama they stopped in Las Vegas, Nevada, where the father visited several large casinos and gambled.
Thereafter, W. lived with the father except for rare occasions when the mother was allowed visitation with him in her house. On April 2, 2004, the trial court entered a handwritten order placing temporary custody of W. with the father. On July 20, 2004, the trial court entered a handwritten order placing permanent custody of W. with the father. The mother appealed.
The mother states in both her petition and her brief to this Court that W. has been arrested and has continued to have emotional problems while he has been in the father's custody, but these events appear to have occurred after the mother filed her notice of appeal and, consequently, are not in the record.
C. Proceedings in the Court of Civil Appeals
On December 2, 2005, the Court of Civil Appeals affirmed, without opinion, the orders of the trial court. Martin v.Martin (No. 2031037), ___ So.2d ___ (Ala.Civ.App. 2005) (table). Judge Murdock issued the no-opinion affirmance; Judge Crawley, Judge Pittman, and Judge Bryan concurred; and Judge Thompson dissented, without writing. The mother apparently did not file an application for rehearing in the Court of Civil Appeals.
D. Proceedings in the Supreme Court
The mother filed a petition for a writ of certiorari with this Court on December 14, 2005. On August 16, 2006, this Court granted the petition. The mother filed a brief on August 30, 2006; the father has submitted nothing. On October 11, 2006, the case was submitted to this Court on the mother's petition and brief.
 II. Standard of Review
When evidence is presented ore tenus and the trial court "`resolves conflicting questions of fact in favor of one of the parties, its findings will not be disturbed on appeal unless they were clearly erroneous or manifestly unjust.'"Lilly v. Palmer, 495 So.2d 522, 525 (Ala. 1986) (quotingScarbrough v. Smith, 445 So.2d 553, 555 (Ala. 1984)). However, when the question presented on appeal is one of law, the ore tenus rule has no application. Ex partePerkins, 646 So.2d 46, 47 (Ala. 1994). Likewise, "there is no presumption of correctness in the trial court's application of the law to the facts." Amie v. Conrey,801 So.2d 841, 846 (Ala.Civ.App. 2001).
 III. Analysis
A. Custody
In Wood v. Wood, 333 So.2d 826 (Ala.Civ.App. 1976), the Court of Civil Appeals stated that the basic principle that a child's custody should not be changed unless there is a strong showing that the change is necessary — i.e., the "changed circumstance doctrine" —
 "is a rule of repose, allowing the child, whose welfare is paramount, the valuable *Page 87 
benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned."
333 So.2d at 828. This Court quoted the above language in Exparte McLendon, 455 So.2d 863 (Ala. 1984), and theMcLendon test for a change of custody after custody is awarded in a divorce judgment is that the noncustodial parent seeking a change in custody must demonstrate (1) that he is fit to be the custodial parent; (2) that material changes that affect the child's welfare have occurred since the original award of custody; and (3) that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child.
Subsequent cases have made the burden of the noncustodial parent even heavier. Rich v. Rich, 887 So.2d 289 (Ala.Civ.App. 2004), applied the McLendon burden to temporary changes of custody as well as permanent changes. Sexton v.Lambert, 611 So.2d 385 (Ala.Civ.App. 1992), noted that theMcLendon burden is "a very heavy burden."611 So.2d at 387. Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App. 1992), also described the McLendon burden as a "heavy burden" and added that the evidence in support of a modification of custody "must be so substantial as to disclose an obvious and overwhelming necessity for a change." 610 So.2d at 1169. See also Whitfield v. Whitfield, 570 So.2d 700, 702
(Ala.Civ.App. 1990); and Braswell v. Braswell,460 So.2d 1339, 1341 (Ala.Civ.App. 1984).
The handwritten order of the trial court dated April 2, 2004, placing temporary custody of W. with the father, reads:
 "After hearing testimony and being presented with evidence at three hearings, 1/12/04, 3/16/04 
3/22/04, this Court is ordering the custody of [W.] to be placed temporarily with the Plaintiff, John Martin. 1) The Court feels that material changes have occurred which affect the welfare of [W.]. These material changes were brought about by the Mother's decision to send the child to a Wilderness Camp in Utah in Jan. 2) The Court feels that John Martin has demonstrated his fitness to be the custodial parent. 3) The Court further believes the positive good brought about by the change in custody will more than offset any disruptive effect of uprooting the child. The Deft., Julie Martin, is to have visitation with the child every Monday from 6 pm to 6 am Tuesday and every other weekend beginning 4-2-04. It is further ordered that neither party will engage in any gambling, use of alcohol or controlled substances and will not cohabit with an adult of the same or opposite sex while [W.] is in their custody and control. Hearing on permanent custody is set June 29-04 (9 am). All other motions are denied."
The handwritten order of the trial court dated July 20, 2004, placing permanent custody of W. with the father, reads:
 "Hearing on Permanent Change of Custody concluded with evidence at numerous hearings beginning 1/12/04. The Court is ordering there be a change in the custody of [W.]. The Plaintiff father and Deft Mother, will have joint custody of [W.], with the Plaintiff father being *Page 88 
the custodial parent and the Defendant Mother having standard visitation; which is proceeding now. Plaintiff father may reduce the child support he is now ordered to pay to the Deft. Mother by $1000.00 per month, retroactive to May 04. The Court feels that material changes have occurred which affect the Welfare of [W.]. These material changes were brought about by the Deft. Mother's decision to send [W.] to a Wilderness Camp in Utah in Jan. of this year, when less drastic measures could have been tried. Also the Deft. Mother's placement of the Child under surveilance [sic] by Private Investigators has further eroded the trust necessary for a successful relationship between a parent and a teenage son. The Court feels that John Martin has demonstrated his fitness to be the custodial parent. The Court further believes the positive good brought about by the change in custody will more than offset any disruptive effect of uprooting the Child. It is further ordered that neither party will engage in any gambling, use of alcohol or nonprescribed controlled substances and will not cohabit with an adult of the same or opposite sex while [W.] is in their custody and control. Plaintiff and Defendant are to advise the other of any upcoming events in which [W.] will participate. Neither parent is [to] speak unfavorably of the other in the Child's presence. All other motions which have been filed to date are denied."
On the surface, the trial court recites language that indicates that it is applying the McLendon test. However, this Court cannot agree that the McLendon test, properly applied, leads one to the conclusion that the mother's decision to send W. to a licensed wilderness-treatment program is a material and detrimental change of circumstances affecting the child's welfare or that the father is a fit custodial parent in light of the testimony about his drinking and gambling.
Furthermore, this Court notes once again that theMcLendon burden is "a very heavy burden." Sexton v.Lambert, 611 So.2d at 387. We also note that the evidence in support of a modification of custody must be substantial and must demonstrate an overwhelming necessity for a change, as required by Klapal v. Brannon, 610 So.2d at 1169. Accordingly, we reverse the trial court's order placing custody of W. with the father and remand the case to the trial court with instructions to enter an order placing W. in the custody of his mother.
B. Attorney Fees and Child Support
The mother contends that the trial court erred in refusing to order the father to pay the mother's attorney fees and the other costs she incurred in defending against his motion for a change of custody. "An attorney fee is ordinarily available in a modification proceeding because it is merely an extension of the original divorce action, and such a fee may be awarded without a finding of contempt." Conrey, 801 So.2d at 847. In awarding an attorney fee, it is appropriate to consider the "earning capacity of the parties" and "the financial circumstances of the parties," 801 So.2d at 847, as well as the fact that the mother here has "no skills that would assist her in acquiring an estate large or small." Burgess v.Burgess, 54 Ala.App. 396, 400, 309 So.2d 107, 110 (Civ. 1974). The court should also consider the fact that "the litigation in this case was both protracted and contentious,"Brasfield v. Brasfield 679 So.2d 1091, 1095
(Ala.Civ.App. 1996), and that the mother was compelled to file numerous contempt motions and other motions concerning the case,Deas v. Deas, 747 So.2d 332, 337-38 (Ala.Civ.App. 1999). *Page 89 
The trial court's award of attorney fees to the father and the reduction of child support to be paid by the father to the mother were based upon the father's having prevailed on the custody issue. However, the father is no longer the prevailing party. We therefore reverse the judgment of the trial court on the child-support and attorney-fee issues and remand the cause for further proceedings on those issues consistent with this opinion.
 IV. Conclusion
The trial court's rulings granting the father custody constitute a clearly erroneous application of the law to the facts; these rulings are hereby reversed and the case remanded with instructions to enter an order denying the father's motions for a change of custody and returning custody to the mother and to further consider the award of attorney fees and the issue of child support.
REVERSED AND REMANDED.
SEE, HARWOOD, WOODALL, SMITH, and BOLIN, JJ., concur.
NABERS, C.J., and STUART, J., concur in the result.
LYONS, J., recuses himself.