THOMAS, Judge.
C.E. (“the father”) and C.C.H. “(the mother”) are the parents of B.N.E. (“the child”). The child has been in the custody of the father, a sergeant in United States Army, since 1996 or 1997; the father received court-ordered custody in 1998. In January 2005, the mother petitioned for custody of the child; the juvenile court awarded the mother custody. The father appealed to this court, arguing that the mother had failed to meet the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984). We reversed the judgment of the juvenile court, concluding that the mother had failed to meet the stringent burden imposed by Ex parte McLendon. C.E. v. C.C.H., 922 So.2d 934 (Ala.Civ.App.2005). The child was returned to the custody of her father in August 2005.
The mother filed another petition to modify custody on September 7, 2005.[1] After a trial in June 2006, the juvenile court again awarded custody of the child to the mother. The father appeals, arguing that the mother failed to meet the burden imposed by Ex parte McLendon. We reverse the judgment of the juvenile court awarding custody to the mother.
“When evidence is presented ore ten-us and the trial court ‘ “resolves conflicting questions of fact in favor of one of the parties, its findings will not be disturbed on appeal unless they were clearly erroneous or manifestly unjust.” ’ Lilly v. Palmer, 495 So.2d 522, 525 (Ala.1986) (quoting Scarbrough v. Smith, 445 So.2d 553, 555 (Ala.1984)). However, when the question presented on appeal is one of law, the ore tenus rule has no application. Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). Likewise, ‘there is no presumption of correctness in the trial court’s application of the law to the facts.’ Amie v. Conrey, 801 So.2d 841, 846 (Ala.Civ.App.2001).”
Ex parte Martin, 961 So.2d 83, 86 (Ala.2006).
The testimony at trial indicated that the 13-year-old child, who testified in camera, desired to live with her mother. She reported that she did not get along well with the father’s new wife, S.E. The child said that they did not speak to each other very much. The child also reported that her father was not home very often and that *133 he did not interact with her very much at all. She said that the father required her to keep her room clean and to do dishes three nights per week. She said that he did not allow her to go places, such as parties, alone. She also said that her father and her stepmother would fuss and fight over the father’s not being home with the child. The child also testified that she was closer to her mother than to her father and that when she was with her mother they went places.
The mother testified that she had moved into her current residence, a three-bedroom, two-bath apartment in government-subsidized housing, in January 2006. She also said that she had started new employment at a behavioral-medicine facility in January 2006. According to the mother, she works from 7:00 a.m. to 3:00 p.m., earns $7.84 per hour, and “brings home” almost $400 every two weeks. At the time of trial in June 2006, the mother was still living with D.W., who was currently her fiancé; they planned to marry in August 2006. The mother’s fiancé is employed with a company that installs flooring; his income is approximately $500 per week, from which child support for his two children from a prior relationship is deducted. The mother’s two children from a prior relationship, Ca.H. (“the half sister”) and Ch.H. (“the half brother”) also live with the mother and D.W.
The mother testified that she called the child two times per week but that visiting her had been impossible because of the distance between Alabama and Foot Leonard Wood, Missouri, where the father is currently stationed, and because of her work schedule. According to the mother, she can hear the father and the stepmother “fussing and fighting” when she calls the child. The mother explained that when the child was living with her she always had something to do, including attending school functions such as basketball games or football games or attending parties. The mother said that her brother or sister-in-law would often take the child to parties when the mother was at work.
Both of the child’s half siblings testified. The half sister, who is 14 years old, said that she was close to the child. The half sister makes good grades (A’s and B’s) and is involved in cheerleading and beauty pageants. When asked about her weekends, the half sister replied that she spent them at a friend’s house or “sometimes we’ll practice,” apparently referring to cheer-leading practice. According to the half sister, the mother arrives home late in the evening, around 9:00 p.m., and she and her brother stay at home largely unsupervised except for their grandmother’s checking in on them occasionally.[2] The half brother, who is 16 years old, testified that he thought having the child come back to live with them would be a good idea. According to the half brother, his grades range from A’s to C’s, and, when he was asked what he was doing during the summer while the mother worked, he said that he stayed at home and was just hanging out with some friends.
The father testified that the child made good grades in school, making the honor roll for three semesters. However, the child made three B’s, two C’s, and one A in the grading period before trial. The father said that the child had decided that she wanted to attend summer school because the school was offering an advanced math class she wanted to take. The father *134 said that he supported the child’s decision. The father described the after-school program the child attended each day. The program has a computer lab, a homework lab, a gym and associated activities like basketball, a pool hall, and what the father described as “games”; the program supplies teachers who can assist the students with homework. According to the father, the child is usually at the program from approximately 3:00 p.m. to 5:30 p.m.; however, the child said that the father sometimes arrived to pick her up as late at 7:30 p.m.
The father explained that he expects the child to do her homework first, before participating in any after-school activities. He also agreed that he expected the child to keep her room clean and to wash dishes three nights per week. He said that the child would usually get on the telephone or on the computer when she arrived home in the evenings; the father noted that, to the child’s displeasure, the computer was in his room and he monitored her use of it. The father explained that he might be a little overprotective because the child is a female child. The father explained that he was protective of the child, in part, in reaction to a sexual assault that had occurred on base. He admitted that he would take the child to events and remain at the events with her, but he stated that he would sit in another area. As an example, the father stated that he allowed the child to attend a dance and that he went and sat high in the bleachers so he could be nearby but not in the way; he also recounted that he would take the child and her friends to sporting events and sit in a different section than them during the events.
The father also recounted a typical weekend at his home. He denied going out alone on a regular basis, commenting that he might have gone out without the family on a couple of occasions since he had been at Fort Leonard Wood. The father said that he and the child often went to the gym on Saturday mornings to practice basketball together. On Saturday evenings, he said, they would often order pizza and watch a movie. The father said that they only went to church “on occasion”; he also said that he took the child to the “PX,” the store on base, every weekend. On nice evenings, the father said, he and the child might practice basketball outside or he would go outside and watch the child jump on the trampoline; he also said that his family would sometimes play Monopoly, a board game, or a game he called “Phase Ten.” The father admitted that the child’s relationship with the stepmother was not like one with a mother; he commented that he never expected the stepmother to be the child’s mother. He did describe the relationship between the child and the stepmother as good, noting that they did “girlie things,” such as getting manicures and pedicures together.
The father argues that the mother failed to meet the burden imposed by Ex parte McLendon.
“The correct standard [to be applied in custody-modification proceedings in which one parent was favored over the other in the original custody award] is:
“ ‘... [T]he [noncustodial] parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child’s welfare.’
“Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947), quoting the Supreme Court of Virginia, Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687, 40 L.R.A. 623 (1898).
“Furthermore,
“ ‘[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and *135 the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court’s satisfaction that material changes affecting the child’s welfare since the most recent [judgment] demonstrate that custody should be disturbed to promote the child’s best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.’
“Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976).
“It is not enough that the parent show that she has remarried, reformed her lifestyle, and improved her financial position. Carter v. Harbin, 279 Ala. 237, 184 So.2d 145 (1966); Abel v. Hadder, 404 So.2d 64 (Ala.Civ.App.1981). The parent seeking the custody change must show not only that she is fit, but also that the change of custody ‘materially promotes’ the child’s best interest and welfare.”
Ex parte McLendon, 455 So.2d at 865-66 (emphasis added).
More recently, our supreme court has reiterated that the Ex parte McLendon burden is a heavy burden to be met by the parent seeking a change in custody:
“[T]he McLendon test for a change of custody after custody is awarded in a divorce judgment is that the noncustodial parent seeking a change in custody must demonstrate (1) that he is fit to be the custodial parent; (2) that material changes that affect the child’s welfare have occurred since the original award of custody; and (3) that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child.
“Subsequent cases have made the burden of the noncustodial parent even heavier.... Sexton v. Lambert, 611 So.2d 385 (Ala.Civ.App.1992), noted that the McLendon burden is ‘a very heavy burden.’ 611 So.2d at 387. Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App.1992), also described the McLendon burden as a ‘heavy burden’ and added that the evidence in support of a modification of custody ‘must be so substantial as to disclose an obvious and overwhelming necessity for a change.’ 610 So.2d at 1169. See also Whitfield v. Whitfield, 570 So.2d 700, 702 (Ala.Civ.App.1990); and Braswell v. Braswell, 460 So.2d 1339, 1341 (Ala.Civ.App.1984).”
Ex parte Martin, 961 So.2d at 87.
Based on the testimony at trial, the mother has established only that the child desires to live with her because, from what we can glean from the child’s testimony, she does not like talking to her stepmother, the father does not spend time with her, and when she was in the mother’s custody she got to “go places.” The mother’s circumstances, though different in certain specifics, are essentially the same as the circumstances she was in at the last modification trial. The child’s circumstances have not changed to any material degree. Nothing in the testimony at trial established a material change in circumstances affecting the child’s welfare such that custody should be changed; nor did the evidence demonstrate that the child’s best interests would be materially promoted by placement in her mother’s custody.
As our supreme court has recently reiterated, “the evidence in support of a modification of custody must be substantial and must demonstrate an overwhelming necessity for a change, as required by Klapal v. Brannon, 610 So.2d [1167,] 1169 *136 [(Ala.Civ.App.1992)].” Ex parte Martin, 961 So.2d at 88. We simply cannot find an overwhelming necessity for this custody modification. Thus, we reverse the judgment of the juvenile court and remand the cause for proceedings consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.

. The September 2005 petition seeking custody is the mother’s fourth attempt to modify custody of the child since 1998.

. The record is not entirely clear on this point. The half sister replied to the question "What do ya’ll do before then [referring to when the mother arrives home at 9:00]?” with the answer "My grandma.” Later, she responded affirmatively to the question "Your grandmother comes by and checks on ya'll.”