993 So.2d 456 (2007)
Tina M. BLEDSOE
v.
Earl R. CLEGHORN.
2050153.
Court of Civil Appeals of Alabama.
March 30, 2007.
*457 Max Cassady, Fairhope, for appellant.
Linda S. James, Andalusia, for appellee.
THOMAS, Judge.
Tina M. Bledsoe ("the mother") and Earl R. Cleghorn ("the father") were divorced in 2000. The parties have an adopted daughter, who was five years old at the time of the hearings in this matter; the mother had been awarded custody of the child in the parties' original divorce judgment. That judgment was apparently modified in 2002 to require that the parties meet to exchange the child for visitation purposes at the Evergreen Police Department. In late 2003, the mother's present husband, Steven Bledsoe ("the stepfather"), and the father began having altercations during visitation exchanges, prompting the father to petition the trial court for an emergency temporary restraining order, for a restraining order, to have the mother held in contempt, and to modify the visitation portions of the prior judgment. The mother answered the petition and filed a petition to modify child support and the visitation provisions of the prior judgment. The father then counterpetitioned for a modification of custody. After several continuances, the action was heard on July 21, 2004, August 17, 2004, and November 2, 2004.
After the conclusion of the trial, the trial court kept the case under submission for what it described as an "inordinate amount of time," and, on May 27, 2005, after having engaged in ex parte communications with both parties, the court reopened the case for further testimony to be taken on June 22, 2005. After the additional testimony was concluded, the trial court entered a judgment on June 23, 2005, in which it awarded custody to the father based on a finding that the mother and the stepfather had attempted to damage or destroy the child's relationship with her father.
The mother filed a postjudgment motion that she designated as a "Motion to Reconsider" on July 21, 2005; in that motion she alleged that there was a lack of evidence concerning her fitness to have custody of the child and that the evidence demonstrated that the father had harassed and intimidated the child and, therefore, was not the proper person to be awarded custody of the child. The mother also sought and was granted leave to amend the motion at a later date. See Slaton v. Slaton, 542 So.2d 1242, 1244 (Ala.Civ.App.1989) (explaining that a trial court has discretion to permit an amendment to a postjudgment motion filed pursuant to Rule 59, Ala. R. Civ. P., after 30 days from the entry of the original judgment if the original motion was timely filed and remains pending before the court). The mother secured new counsel on September 2, 2005; *458 the mother's new counsel sought and secured access to the audiotapes of the trial proceedings to assist him in drafting an amended postjudgment motion. The mother's amended postjudgment motion sought to alter, amend, or vacate the judgment or, in the alternative, sought a new trial; the mother alleged "[m]isconduct of the ... prevailing party," as a ground for a new trial. See Ala.Code 1975, § 12-13-11. In addition, the motion challenged the competency of the child to testify; alleged that the child had been "promised" a gift in exchange for her testimony in favor of the father; alleged that the evidence was insufficient to meet the Ex parte McLendon, 455 So.2d 863 (Ala.1984), standard for a modification of custody; and asserted other evidentiary objections, none of which form the basis of an argument on appeal.
After a protracted hearing on the mother's postjudgment motion, the trial court denied the motion and the mother timely appealed to this court. The mother argues that the father did not meet his burden under Ex parte McLendon and that the trial court therefore improperly modified custody based on the parties' visitation disputes and on the fact that the father had taken the child to church with him; she also argues that the trial court should have granted a new trial under § 12-13-11 based on the alleged misconduct of the father's counsel in engaging in ex parte communications with the trial judge[1] and in promising the child a reward for her testimony. Because we find the evidence insufficient to meet the Ex parte McLendon standard, we reverse.
The father is a 37-year-old paraplegic. He is currently a student at a local junior college studying forestry management; he has maintained a 4.0 grade-point average. The father receives $831 in Social Security benefits and $600 in Veteran's Administration benefits each month. Despite his disability, the father testified that he is able to care for the child's needs without assistance, explaining that he has bathed, clothed, and fed the child her entire life. Like the mother, the father is remarried; his wife, Emily Cleghorn ("the stepmother"), has what is described by both the father and the stepmother as a good relationship with the child. The stepmother, who is 28 years old, had worked for a local attorney for approximately 8 years, including during most of the protracted litigation in this case; however, she has completed a speech-pathology program and is currently employed as a special-education teacher.
The father testified that he had more time than the mother to devote to caring for the child, noting that his class schedule permitted him to be home at around noon on Mondays and Wednesdays and to be home around 3:30 p.m., in time to retrieve the child from school, on Tuesdays and Thursdays. The father does not have classes on Fridays. The father further *459 explained that, when the child was in his physical custody, he did not discourage the child from expressing or showing affection for the mother or the stepfather.
The major portion of the father's testimony focused on describing the negative behavior of the mother and, more often, the stepfather during visitation exchanges and at the child's T-ball games. The father's original petition in this action was prompted by an altercation between him and the stepfather during a visitation exchange at which the stepfather punched the father while the father was seated in his vehicle. In addition, the father complained that the stepfather and the mother would deliberately stand in such a way as to block his view of the child at T-ball games; the father would typically remain in his truck during T-ball games because of a temporary restraining order he had secured against the stepfather. In addition, the father explained that the child would seldom do more than look at him and perhaps wave to him and that she was not allowed to come over to speak to him at T-ball games that the child participated in while she was in the mother's custody. He also indicated that the child seemed to be in fear for the father when the stepfather was nearby. The father also recounted an incident when the child indicated that she was confused and upset over being told that she could change her last name to that of the stepfather.
According to the father, the stepmother, and Wesley Sheffield, the coach of the child's T-ball team, the child did not appear to enjoy playing T-ball. In fact, the father said that the stepfather would accompany the child onto the field and stand near her most of the time. Mr. Sheffield testified that the child cried when it was her turn to bat. Mr. Sheffield also explained, without speaking to him first, that the stepfather had announced at one practice that he was also going to help "coach" the team.
Mr. Sheffield's wife also testified. She said that she had witnessed several instances when the stepfather would direct what she termed as "dirty" or "evil" looks toward the father. In addition, Mrs. Sheffield recounted an incident when the stepfather, while in front of the father, picked up the child and told her that "nobody was as proud of her as he was." Mrs. Sheffield explained that it appeared to her that the stepfather was instigating trouble, and she testified that she felt that the comment was inappropriate at the time and in the place that it was made.
According to the father, during telephone visitation, which took place each Wednesday night at 6:30 for 10 minutes, the child would whisper any sentiments of affection out of fear that she would be overheard and punished. In addition, the father said that the child was often encouraged to hang up on the father; that if he called later than exactly 6:30, his 10 minute visits were "docked"; and that if he called later than 6:40, no one answered the telephone.
The father further recounted, and presented documentary evidence indicating, that the mother had insisted that the child not be exposed to pets or kissed on the mouth for health reasons. However, according to the father and a private investigator he had hired to follow the mother and the child, the mother, the stepfather, and other people kissed the child on the mouth. The father also complained that the mother was encouraging the child to call the stepfather "daddy" and was describing the stepfather as the child's "real daddy" while referring to the father by his preferred name, Nicky. In addition, evidence adduced at trial indicated that the stepfather had used derogatory terms and racial slurs when referring to the father. *460 The father alleged that these actions were designed to damage or destroy his relationship with the child.
The mother is a 31-year-old physical therapist. She is employed at a physical-therapy clinic and does a small amount of home-health work for a hospital in Brewton. She and the stepfather live in Evergreen. The mother reported her salary as being $60,000 per year and said that she made $50 plus mileage for home-health visits, which, she stated, varied in number but averaged over the course of a year to be approximately one per week. The mother testified that the child woke up at approximately 6:10 each morning and that the mother and stepfather dropped the child off at school between 7:00 and 7:15; however, the child's school day did not begin until 8:00. After dropping the child off at school, the mother and stepfather would drive to the family restaurant owned and operated by the stepfather, and the mother would then take an automobile that they typically leave at the restaurant to drive to Brewton to work. According to the mother, she would leave Evergreen at approximately 7:20 or 7:25 a.m. and arrive in Brewton at 7:45 for work. She also said that she would arrive home or at the restaurant at 5:15 or 5:30 p.m. at the latest.
The stepfather would retrieve the child from school at 3:00 p.m. most days. The child would then go with the stepfather to the family restaurant or to show real estate until the mother returned home. The stepfather also assisted his father with coaching duties once or twice a week during the school football and baseball seasons; the child would attend the practices with the stepfather.
The mother said that she would pick up the child at the restaurant when the child was there at about 5:30 p.m. The mother denied the father's accusation that the child was at the restaurant until 6:30 or 7:00 at night on a regular basis. She also said that they did not eat at the restaurant often, instead stating that the child normally had her meals at home.
The mother explained that she could not communicate with the father, describing him as "causing chaos." She also said that it was the father and not the stepfather that would "start something" at visitation exchanges; she specifically described an incident at which, she said, the father pulled a knife on the stepfather. The mother also denied any attempts to damage the child's relationship with the father. She denied that she made the child call the stepfather "daddy" or that she made the child call the father by his preferred name. The mother explained that the child had called the stepfather "daddy Steven" but that the child, of her own accord, had dropped the name "Steven" despite their attempts to have the child resume the use of "daddy Steven." She similarly explained that the child had begun using the name "Nicky" to refer to the father because the mother and the stepfather referred to him by that name.
The mother further explained that she was not aware that she and the stepfather had been standing in front of the father's truck at T-ball games, stating that they had simply been standing at the dugout. In addition, the mother denied that she had prevented the father from exercising telephone visitation with the child; however, the mother admitted that she had hung up the telephone when father began speaking to her about visitation issues. Likewise, the mother stated that she had told the child to hang up the telephone if the father was "trying to get something started."
The trial court examined the child in camera on two occasions during the course of the litigation. Although the child's testimony was, because of her age, rather limited, it was apparent that the child *461 loved both parents and that she harbored no ill feelings toward her stepparents. She indicated that all of her "parents" took good care of her and treated her well. She expressed that she was glad to see each parent during their respective custodial periods. She did indicate a desire to live with the father and stepmother.
Recently, our supreme court has reiterated that the Ex parte McLendon burden is a heavy burden on the parent seeking a change in custody:
"[T]he McLendon test for a change of custody after custody is awarded in a divorce judgment is that the noncustodial parent seeking a change in custody must demonstrate (1) that he is fit to be the custodial parent; (2) that material changes that affect the child's welfare have occurred since the original award of custody; and (3) that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child.
"Subsequent cases have made the burden of the noncustodial parent even heavier.... Sexton v. Lambert, 611 So.2d 385 (Ala.Civ.App.1992), noted that the McLendon burden is `a very heavy burden.' 611 So.2d at 387. Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App. 1992), also described the McLendon burden as a `heavy burden' and added that the evidence in support of a modification of custody `must be so substantial as to disclose an obvious and overwhelming necessity for a change.' 610 So.2d at 1169. See also Whitfield v. Whitfield, 570 So.2d 700, 702 (Ala.Civ.App.1990); and Braswell v. Braswell, 460 So.2d 1339, 1341 (Ala.Civ.App. 1984)."
Ex parte Martin, 961 So.2d 83, 87 (Ala. 2006). In addition, our review of custody determinations based on ore tenus evidence is quite limited; the trial court's custody judgment is presumed correct and should be reversed only if the judgment is plainly and palpably wrong. Bates v. Bates, 678 So.2d 1160, 1161-62 (Ala.Civ. App.1996).
The mother's first argument is that the trial court improperly changed custody based on the visitation disputes between the parties. She is correct that visitation disputes, alone, are not a sufficient basis upon which to modify an existing custody judgment. Kelley v. Akers, 793 So.2d 821, 826-27 (Ala.Civ.App.2001); Vick v. Vick, 688 So.2d 852, 856 (Ala.Civ. App.1997); Means v. Means, 512 So.2d 1386, 1389 (Ala.Civ.App.1987); and Pons v. Phillips, 406 So.2d 932, 935 (Ala.Civ.App. 1981). However, as the father points out, when visitation problems are coupled with one parent's attempts to damage or destroy the other parent's relationship with the child, a change of custody may be warranted. CJ.L. v. M.W.B., 879 So.2d 1169, 1180 (Ala.Civ.App.2003). Although the present case was initiated because of a visitation dispute and although the trial court did focus on the behavior of the mother and the stepfather at visitation exchanges, during telephone visitation, and at other times to evaluate their conduct, we do not construe the judgment changing custody as being based merely on a visitation dispute. We instead conclude that the trial court improperly based its decision to modify custody in the present case on an erroneous conclusion that a change of custody was necessary to materially promote the child's best interest and welfare.
As noted above, when a divorce judgment awards custody to one parent, a trial court may modify custody only upon a showing of a material change of circumstances and when the noncustodial parent demonstrates that the child's best interest will be materially promoted by the proposed change in custody such that any disruption caused by that proposed change in custody would be offset by the benefit brought about by the proposed change. *462 See Ex parte McLendon, 455 So.2d at 866. In addition, a noncustodial parent must prove an obvious and overwhelming necessity for the change of custody. Ex parte Martin, 961 So.2d at 88. Based upon our review of the record, we cannot conclude that the father presented such evidence in the present case. Most of the testimony concerned the disputes between the father and the mother or between the father and the stepfather and did not reveal a material change affecting the welfare of the child, focus on how a change in custody would materially benefit the child, or demonstrate an overwhelming and obvious need for a change in custody. Therefore, we reverse the trial court's judgment modifying custody to the father and remand the cause for proceedings consistent with this opinion. In light of our reversal on this ground, we pretermit the other arguments raised by the mother on appeal. See Favorite Market Store d/b/a F.M. Serv. Corp. v. Waldrop, 924 So.2d 719, 723 (Ala.Civ. App.2005) (pretermitting discussion of additional issues when the decided issue was dispositive of the case).
The father's request for an attorney fee on appeal is denied.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs specially, with writing.
BRYAN, Judge, concurring specially.
I do not believe that the father proved by substantial evidence that custody of the child should be changed as is required by Ex parte McLendon, 455 So.2d 863 (Ala. 1984). Moreover, the father failed to demonstrate "an overwhelming necessity for a change." Ex parte Martin, 961 So.2d 83, 88 (Ala.2006). I have my reservations about the "overwhelming necessity for a change" standard articulated in Glover v. Singleton, 598 So.2d 995 (Ala.Civ. App.1992); Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App.1992); and Ex parte Peppers, 703 So.2d 299 (Ala.1997). I believe that the "overwhelming necessity for a change" standard is an additional principle that has been grafted onto the Ex parte McLendon standard and was not initially contemplated by the Supreme Court when it decided Ex parte McLendon. However, with its release of Ex parte Martin, the Supreme Court has made it abundantly clear that the "overwhelming necessity for a change" standard is a factor that must be considered when a change of custody is contemplated. Because I am constrained by the decisions of the Supreme Court[2] and because I do not believe that the father in this case demonstrated that an "overwhelming necessity for a change" in custody existed, I must concur specially reversing the trial court's judgment and remanding the case to the trial court.
NOTES
[1] We agree with the general principle of law supporting the mother's argument. See, generally, Ex parte R.D.N., 918 So.2d 100, 103-04 (Ala.2005) (explaining that, in a child-custody case, a guardian ad litem, like any other attorney in the case, is not permitted to have ex parte communications with the trial court regarding the issues before the court because such communications are a denial of the opposing party's due-process rights). The record reveals that the father's attorney made a comment to the trial judge and questioned when an order might be forthcoming in the case and that the stepfather telephoned the trial judge at home to speak about the behavior of the father. Certainly, no party or attorney for any party should attempt to engage the trial court in ex parte communications during the pendency of litigation. In light of our disposition of this appeal, however, we pretermit discussion of the mother's argument on this point. See Favorite Market Store d/b/a F.M. Serv. Corp. v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (pretermitting discussion of additional issues when the decided issue was dispositive of the case).
[2] See § 12-3-16, Ala.Code 1975 ("[t]he decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals...."); and Ex parte Chatmon, 968 So.2d 999, 1003 (Ala.Civ.App.2007).