CRAWLEY, Judge.
L.M.J. (“the mother”) and J.I.J. (“the father”) were divorced in December 2000. The divorce judgment awarded the parties joint legal custody of their daughter, L.J. (“the daughter”), and awarded the mother sole physical custody, subject to the father’s right of visitation. In late December 2001 or early January 2002, while the daughter and her half sister, L.P., were visiting with the father at the residence of the father’s girlfriend, K.B., the girlfriend’s son, R.B., allegedly touched both girls inappropriately. Visitation with the father continued until April 2002, when the mother informed the father that the daughter would no longer visit with him.
The father then filed the first of three contempt petitions alleging that the mother had refused the father visitation and requesting that the mother be held in contempt and that the father be awarded sole physical custody of the daughter. The mother answered the petition in May, and, in June, she filed a counterclaim, for the first time alleging that R.B. had molested the daughter. In July, the parties reached an agreement whereby the children involved would receive an independent evaluation and counseling, the father’s visitation would resume, and the daughter would not be in the presence of R.B.
Despite this agreement, the father’s visitation did not resume. In fact, although the father’s regular visitation weekend was June 22, the mother did not permit him to visit with the daughter that weekend or during any weekend in July. In August, the father filed his second petition for contempt. The father was permitted an overnight visitation on Friday, August 17. The father had to work on Saturday, August 18, so he returned the daughter to the mother early Saturday morning.
At a hearing on the second petition in September, the mother testified concerning the daughter’s behavior when she was told she had to go to visit with her father. The mother reported that the daughter exhibited signs of nervousness in the hours before visitation such as biting her fingernails, that the daughter would get so upset that she would vomit, and that she would pull away from the mother and run back into the house when they attempted to leave to visit the father. The daughter’s testimony at a later hearing was that she “threw a fit” each time she was told she had to visit with the father.
Debbie Burt, the forensic interviewer at the Children’s Advocacy Center in DeKalb County, testified that she had interviewed both the daughter and her half sister, L.P., and that she found their allegations that R.B. had molested them credible. She also reported that the daughter felt that her father did not believe her allegations, but she said that the daughter was not afraid of her father. Ms. Burt did note that the daughter had commented that she would like her father to visit with her at her mother’s house.
The father also testified at the September hearing. He explained that the mother had indicated to him in a telephone call in April that she no longer wanted him to visit with the daughter because he did not make his girlfriend’s children share with the daughter. He also said that the mother had telephoned his home to check on the daughter late in the evening of August 17; during that call, he said, she requested that he admit that the alleged molestation had occurred, and, when he refused, he said, she became verbally abusive and cursed at him.
The trial court ordered the mother to comply with the visitation provisions of the divorce judgment and ordered parties to attend counseling with Dr. David Wilson of Gadsden Psychological Services. The fa *360 ther complied with this order, and a report concerning his sessions with Dr. Wilson is in the record; however, neither the mother nor the child attended the scheduled sessions.
The father filed his third contempt petition on October 1, 2001. At the November hearing on that petition, the father testified that he had not exercised visitation between August 17 and October 5; on October 5, the mother, in response to the contempt petition, had allowed the daughter to visit with the father for the weekend. He again relayed his opinion that the alleged molestation never occurred. He also presented letters the daughter had written to R.B. and his girlfriend indicating that she loved them.
The mother testified, indicating again that she had refused to let the father see the daughter because, she said, the daughter did not want to attend visitation and because the father did not believe the daughter’s allegation that R.B. had molested her. The husband then played tape recordings of conversations between him and the mother. The first tape contained a conversation that allegedly occurred in May or June 2001, in which the father accused the mother of damaging property at his house. During the conversation, the mother denied these allegations. Both parties used profanity during the conversation. The second tape contained a conversation that allegedly occurred in April 2001 about why the mother was refusing to allow the father to visit with the daughter. During this long conversation, the mother referred repeatedly to the daughter’s “being run over” by the girlfriend’s children and the father’s not spending quality time with the daughter. The father, for his part, repeatedly asked the mother to allow him to speak with the daughter, despite the mother’s clear and continued denial of his request. Again, both parties eventually resorted to profanity to communicate.
The father’s counsel questioned the mother about disturbances at her home. Specifically, he asked about an incident involving a neighbor and her 15-year-old daughter, reports of harassing telephone calls, and an incident during which the mother was arrested. The mother explained that the harassing telephone calls she reported were made by the father. She commented that the other two problems, which involved a former boyfriend, had been resolved. She denied that the boyfriend had ever lived with her at her residence.
The mother’s mother, G.B. (“the grandmother”), also testified at the November hearing. She explained that she and the mother no longer had a good relationship; in fact, the mother successfully defended a grandparent-visitation action brought by the grandmother in Georgia. The grandmother testified that the mother’s reputation in the community was generally bad; specifically, the grandmother noted that the mother had a bad reputation concerning truthfulness and chastity and that she had a reputation as a troublemaker. The grandmother also opined that the mother would lie to get what she wanted and that the children would do whatever the mother told them to do because they were afraid of her. According to the grandmother, the mother had, when she lived with the grandmother in Georgia shortly before the divorce, left her children with the grandmother not only during the hours she worked, but also during the hours she was not working so that she could see her boyfriend. The grandmother opined that L.J. would be better off with the father.
The father’s girlfriend then testified. She denied that her son, R.B., would have molested L.J. or L.P. She explained that the children had always gotten along well *361 and played together. Photographs of the children playing together appear in the record.
The daughter; her half sister, L.P.; the alleged molester, R.B.; and A.H., R.B.’s half sister all testified. Their accounts of what happened the night of the alleged molestation differ. R.B. remembers watching a Christmas-themed movie in the living room and playing “grocery store” and “school.” He denied touching either L.J. or L.P. in any inappropriate way. A.H., the older half sister of R.B., stated that the younger children had watched a movie while she and a friend who was visiting used the computer to access the Internet. She explained that the air mattress on which the children were playing was located directly behind the computer desk. She said that she had not seen anything and that none of the children had cried out or complained that there had been a problem.
The daughter testified that she, her half-sister, and R.B. had left the living room and that they had gone into R.B.’s room to play a game and that the alleged molestation occurred in R.B.’s room. She reported that R.B. had touched her and her sister’s “private” while they were all on his bed. She said that she and her half sister had gone into the girlfriend’s bedroom to report the incident to the father. According to the daughter, the father said “if we didn’t go back and lay down, we was gonna get our butt whipped.... But, actually, he used the curse word.” When the children returned to the girlfriend’s bedroom, according to the daughter, the girlfriend told them “[y]ou all go lay down. It’s okay. He can sleep with you right there — he can sleep with you all.” When questioned about exactly what she told her father, the daughter answered, “I told them that he was bothering me and my sister. That we couldn’t sleep because he was turning the TV on and off, and he wouldn't leave us alone where we could sleep.” When questioned specifically about whether she reported that R.B. had touched her inappropriately, she answered positively, “Uh-huh.”
The half sister also testified. Her report differed in some details. She recalls that A.H. was not present that evening because she had gone to spend the night with a friend. She remembers having to make R.B. allow her sister to play with the cash register and that they watched a movie or some music awards on television. According to the half sister, they went into R.B.’s room to look for a game. At that point, she said, R.B. touched her and then her sister in their “wrong spots.” Her account, however, included a description of R.B. getting on top of both girls and touching them, through his clothes, with his “privates.” She also reported telling the father and the girlfriend, who both responded, in her account, similarly to the way the daughter described.
The trial court found the mother in contempt, sentenced her to confinement in the county jail for five days for each visitation period she failed to deliver the child to the father (the order does not indicate the total number), and suspended that sentence provided she complied with the court’s further orders. In addition, the court awarded sole physical custody of the daughter to the father, subject to the mother’s visitation rights. The mother appeals, arguing that the trial court modified custody without a request for modification and that the trial court improperly modified custody on the basis of the parties’ continuing visitation dispute.
Although the record does not contain an actual modification petition, the father did request custody in his first contempt petition. In addition, the father clearly indicated in his testimony at the November hearing that he was seeking custody; the mother’s counsel did not object. William *362 son v. Williamson, 391 So.2d 115, 118 (Ala.Civ.App.1980) (indicating that a failure to object to testimony on an issue supports a determination that the issue was tried by the consent of the parties). The court, shortly after the father’s testimony on his desire that he receive custody, also indicated that the issue of custody was under consideration. Therefore, we conclude that the issue of custody modification was before the court based on the father’s request in his contempt petition, or, at least, that it was tried by the consent of the parties at the November hearing. Rule 15(b); Williamson, 391 So.2d at 118.
The mother also argues that a visitation dispute, alone, is insufficient to justify a change in custody. Indeed, the law on that point is abundantly clear. Kelley v. Akers, 793 So.2d 821, 826-27 (Ala.Civ.App.2001); Vick v. Vick, 688 So.2d 852, 856 (Ala.Civ.App.1997); Means v. Means, 512 So.2d 1386, 1389 (Ala.Civ.App.1987); Pons v. Phillips, 406 So.2d 932, 935 (Ala.Civ.App.1981). In addition, to modify custody where one parent has been awarded physical custody to the exclusion of the other, a trial court must apply the standard set out by our supreme court in Ex parte McLendon, 455 So.2d 863, 866 (Ala.1984). The McLendon standard is well settled. A parent seeking a change in custody must establish that the change would materially promote the interests and welfare of the child and that the benefits of the change in custody would “more than offset the inherently disruptive effect caused by uprooting the child.” King v. King, 521 So.2d 69, 70 (Ala.Civ.App.1988) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).
The trial court’s December judgment does not indicate what standard it applied to the father’s request for a change of custody in this case. However, at a brief hearing in June 2001, the trial court indicated its apparent belief that a change of custody would be an appropriate sanction for contempt. The court stated, “[violation of this order will result in sanctions ... against that person violating the order, which could include contempt or a change in custody, or other sanctions as [the court] may deem appropriate.” (Emphasis added.)
In light of the trial court’s failure to indicate in its judgment that it applied McLendon, the trial court’s comments, and the finding of contempt contained in the judgment, it appears that the trial court changed custody to the father as a sanction for the mother’s continued contempt of the visitation provisions of the divorce judgment and subsequent in-court agreements to permit visitation provided R.B. was not present. As discussed previously, visitation disputes, alone, are not a basis for a change of custody. Kelley, 793 So.2d at 826-27; Vick, 688 So.2d at 856; Means, 512 So.2d at 1389; Pons, 406 So.2d at 935. In addition, the record, although clearly indicating that the mother has not adhered to the visitation schedule, does not contain evidence sufficient to compel the conclusion that a change of custody would materially promote the daughter’s best interests. See Ex parte McLendon, 455 So.2d at 866. For that reason, even if the trial court had applied the McLendon standard, this court could not affirm its judgment. Therefore, we reverse the judgment awarding custody to the father and remand the case for the entry of a judgment denying the modification.
REVERSED AND REMANDED.
PITTMAN and MURDOCK, JJ., concur.
YATES, P.J., and THOMPSON, J., concur in the result.