Rel: October 3, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

————————————————

## CL-2024-0992

————————————————

## J.D.S.

## v.

## S.G.S.

## Appeal from Lee Circuit Court
## (DR-15-900408.02)

HANSON, Judge.

J.D.S. ("the father") appeals from a judgment entered by the Lee Circuit Court ("the trial court") in an action in which he sought to modify the judgment that had divorced him from S.G.S. ("the mother"). We affirm in part and reverse in part.

Background

The father and the mother divorced on November 28, 2016. The divorce judgment incorporated a settlement agreement between the parties. Four children, all daughters, were born of the marriage: A.B.S. (born in 2007), M.C.S. (born in 2009), L.E.S. (born in 2010), and S.K.S. (born in 2011). Pursuant to the terms of the divorce judgment, the parties had joint legal custody with the mother having sole physical custody subject to the father's visitation rights. The father's schedule included visitation every other weekend, Sunday dinner from 5:00 p.m. to 7:00 p.m. on weekends when he did not have visitation, and every Tuesday night from 5:00 p.m. to 8:00 a.m. on Wednesday or the children's return to school. Both parties had two weeks of summer vacation with the children. The father's child-support obligation was $2,000 per month. The father also paid $250 per month for the children's extracurricular activities. The father agreed to pay the children's health-insurance premiums along with 80% of the children's uncovered medical and dental expenses. The father was ordered to pay the mother periodic alimony for five years.

On August 9, 2021, the father filed a petition seeking an order

holding the mother in contempt and seeking a modification of his visitation schedule. On September 16, 2021, the mother filed an answer and a counterclaim seeking an order holding the father in contempt and seeking a modification of (1) child support, (2) the right to claim certain tax exemptions for the children, and (3) the father's visitation schedule. On January 20, 2022, the father amended his petition, asserting additional contempt allegations. On January 21, 2022, the mother filed an answer to the amended petition. On March 14, 2022, the father filed a second amended petition, asserting additional contempt allegations, to which the mother filed an answer.

On May 25, 2022, the father filed a motion seeking the children's passports because, he said, he had planned an overseas trip with the children and the mother had refused to return the passports in violation of the parties' divorce judgment. On June 8, 2022, the trial court granted the motion. Subsequently, the trip was canceled. On June 16, 2022, the mother filed a motion requesting the return of the passports because, she said, the father's behavior had been "bizarre" and there were no current plans for overseas travel. On June 17, 2022, the trial court ordered the father to return the passports to the mother.

On June 23, 2022, the father filed a motion seeking a modification of the summer-visitation schedule because, he said, the mother had interfered with his visitation. Ultimately, the trial court entered an order allowing the father additional summer visitation because the mother "unreasonably and without justification unilaterally" had denied the father certain visitation.

On February 7, 2023, the father filed a third amended petition seeking (1) to modify custody so that the parties would have joint physical custody, (2) to modify his child-support obligation, and (3) to hold the mother in contempt for violating the divorce judgment. On April 4, 2023, the mother filed a motion for a status conference. On July 17, 2023, the mother filed an emergency motion for return of one of the children because, she said, the father had not returned the child after the parties had swapped visitation days. That same day, the mother filed an amended counterclaim alleging that the father had violated the divorce judgment. After a hearing, the trial court ordered the father to return the child to the mother.

The trial began on November 2, 2023, and was completed on November 3, 2023. The father testified that the visitation schedule has

4

been a problem since the parties divorced. He stated that the mother had interfered with his visitation by taking the children on a trip during his visitation weekend and provided other examples of her interference. The husband stated that it was difficult to schedule his two summer-vacation weeks. The husband testified that the wife had "obstructed" a lot of events. He stated that the wife had made "unilateral" decisions with regard to missing or being late for his visitation with the children. Regarding the mother's interference with his visitation, the father's counsel and the father engaged in the following exchange:

> "A. Yes. Just some kind of recognition that, you know, my time is to be protected and not interfered with and that I can budget that time as I see fit, you know, for example, it's time to pick up the kids and I'm out of town and I send my mom to pick them up for me, you know, there have been numerous occasions where she's prevented my mom from being able to pick the kids up because she says that she doesn't have to recognize grandparents' rights.
>
> "Q. Yes.
>
> "A. On my time.
>
> "Q. Well, if your mother -- on those times when your mother was not allowed to pick up your children, would you still be able to exercise your visitation or did [the mother] treat it as forfeited?
>
> "A. Well, there's been several instances where she was like, you forfeited the whole thing."

5

The father testified that, to limit "ping-ponging" the children back and forth between the parents' houses, he had originally requested in his petition that the children stay with him until Wednesday during weeks when he has visitation weekends, because they would be at his house on Tuesday night until Wednesday morning and it would only add a Monday to his visitation. The father later amended his petition to seek joint physical custody. He explained that he had amended his petition because the mother had continued to interfere with his visitation while the action was pending. The father testified that the mother refuses to speak with him and that their only communication is through texts and emails.

The father testified that the mother, contrary to the divorce judgment, had made the decision to place the children in counseling without consulting him or telling him that she had done so. The father further stated that one of the children has medical issues requiring treatment at Children's Hospital and that the mother would not keep him informed of that child's medical appointments. He also said that, when he had asked the mother why she had not informed him of one of the children's school performances, the mother had told him to call the

6

school. The father testified that the mother had told the employees at the children's schools that he had no right to pick up the children. The father testified that the principal had had to be contacted when the father had tried to bring one of the children a sports/track watch that the child had left at his house. When asked about two cotillion events for one of the children, the father explained:

> "A. Well, there was like two separate -- like a two tiered event on two different dates. And the first one, [the child] told me about after the fact, I think she said, you know, Papa I wanted you to be there but Mom wouldn't let you go so Dada took me which is [the mother's] dad. She said I was the only girl there whose dad wasn't with them. And there was another, like, dance coming up. And so I texted [the mother] about it and I said, hey, … I really want to take her to that. That's an opportunity, that's something I want to do with her. And she refused to let me go. She said [her] parents paid for it, you know, you can't go for that reason. You know, I talked to her dad about it. He didn't care. He was fine with me going. But long story short, [the child] didn't go. She would rather prevent [the child] from going to the dance than me getting to go with her, so [the child] just didn't go at all."

The father testified that when one of the children had asked the mother for one-week-on and one-week-off visitation with the father, the mother had "shut it down." He also said that he had reached out to both the mother and her father to come to an agreement while this action was pending and that the mother had never responded, although her father

7

had responded. The father testified that the children have chores to do while they are at his house and that the children are not supposed to purchase things without his permission. The father stated that he encourages the children to communicate with the mother. When asked whether he had input on the children's academics, the father testified:

> "A. No. For example, [A.B.S.] is approaching, you know, the age, the stage where you begin looking at colleges. I have tried to take her on various college visits, have been told by [the mother] that I can only take her on my time. And I have said to [the mother], you know, [the three younger children], they don't have any interest in going to Oxford, Mississippi to tour Ole' Miss. You know, they're not ready for that yet. It would be a lot easier if I could just take her when [the younger children] are with you. There's no room to have that conversation. I study with the kids. The kids do lean on [the mother] for math. I'm terrible at math, you know. [The mother's] good at it. They lean on her for that, as well as they should. I encourage them to. She's much better at that than I am. But I study with them."

The father testified that his house has four bedrooms to accommodate the children and that his house and the mother's house are two miles apart. He stated that the children would not be "uprooted" by a joint-physical-custody arrangement because the parties live so close to each other. The father asked for Christmas visitation, that his parents be allowed to pick up the children without interference from the mother, and that the mother reinstate the father as a parent who could check the

8

children in and out of their schools.

On cross-examination, the father testified that he had entered into a settlement agreement with the mother that was incorporated into the trial court's divorce judgment in 2016. The father stated that he did not log in to "Schoology" to find out about the children's school because he did not have a password, although one of the children had shown the website to him. The father admitted that he had not paid for the oldest child to take a college-exam preparatory class and that he had not signed the children up for activities like "Summer Showoffs." He stated that he had helped the children with science projects.

The father was asked whether he had helped A.B.S., the oldest child, purchase an automobile. The following email exchange between the mother and the father occurred on February 1, 2023, regarding cars for the children:

> "[The mother]: I received your text message regarding a potential car for [A.B.S.]. At this time [A.B.S.] only has $2,200 saved up for a car. Her goal is to have 2,500 saved by her birthday. If you would like to help with the purchase of the car, you can write a check to her up to the matching amount of $2,500. The car title will be in my name until she reaches 18. You're welcome to pass along any leads you find on the car and contact information. But she and I will handle the final decision and the purchase. If you change your mind on

assisting her in the purchase financially, please let me know so she can plan accordingly.

"[The father]: I'm out then. Not going to be treated like a child. Good luck."

The father admitted that he and the mother had different rules on the older children's car usage. The father admitted that he and the mother also had different rules on the children's use of cellular telephones. The father admitted that he had blocked the mother on his phone and the children's phones because the mother had taken one of the children's phones away and had not let the child communicate with the father. The father admitted that he had taken the children on a number of vacations. The father also admitted that the children have used his credit card to purchase clothing and cosmetics.

The father testified that he had taxable income of $550,000 in 2021 and $468,980 in 2022. In 2020, the father had taxable income of $220,504. The father testified that he was a consultant and that his income varies. He stated that he had sold a company investment in 2022, which had increased his taxable income. The father testified that the mother has a master's degree in education administration but that she had not held a job in that field. The father admitted that he had made

mistakes during the parties' marriage.

The mother testified that she was unsure how many times she had agreed to the father's requested summer-vacation weeks. She stated that the children's schedule and summer camps dictated the availability of his two weeks of summer vacation. The mother could not remember whether she had prevented the father's mother from exercising the father's visitation with three of the children when the father had taken one of the children on a special trip. The mother admitted that there had been times when the father had not gotten to visit with the children. She stated that the father had been allowed to make up certain missed visitation sessions. The mother admitted that the father had not been allowed to see the children on Father's Day in 2022, in contravention of the divorce judgment. The mother stated that she had not let the father see the children the day after that Father's Day either. The mother admitted that there was no court order that allowed the mother to make unilateral decisions regarding the children. The mother admitted that she had not told the father about any of the children's "well-child" visits with their pediatrician. The mother admitted that one of the reasons that she had not wanted the father at the child's cotillion events was

11

because her parents had paid for that activity.

The mother testified that, in 2016, the father had agreed that he would have the children for the Thanksgiving holidays and that she would have the children over the Christmas holidays. The mother did not want to change the current holiday traditions. The mother testified as to numerous days when the father had returned the children late. The mother testified that she was not asking the trial court for any reimbursement for the car for the oldest child. The mother stated that she had used that purchase as an opportunity to teach the child how to budget, that the child had saved money, and that the maternal grandparents had helped the mother to match the money the child had saved to purchase the car. The mother testified that the other children were going to do the same when purchasing a car. The mother testified regarding her rules for operating the car and for the use of phones when the children were with her.

The mother testified that she works for "All Things Ministries," earning $60,000 a year. She said that the job allows her flexibility with the children. The trial court admitted an exhibit from the mother, which contained a summary of her monthly expenses. Counsel for the mother

said that the document contained a summary of information from the mother's bank statements and that the father had copies of the bank statements.[1]  The mother estimated that the costs of the children's monthly extracurricular activities totaled $1,195.  The mother also included in her summary her house payment, her homeowner's association fees, her utility expenses, the cost of a housekeeper, and medical expenses, among other things.  The mother also included her gasoline and car-insurance expenses and the gasoline and car-insurance expenses for the child that had purchased a car with her savings.  The mother also included "car savings," which appears to be the cost of "matching" the other children's savings when they are old enough to purchase and drive a car, as a monthly expense.  The mother explained that she had added most of the expenses, divided that number by five (to account for the mother and the four children), and then multiplied that number by four to calculate what the father should contribute toward the children's monthly expenses to calculate his child-support obligation. The mother testified that she wanted $6,200 a month in child support. The mother admitted that she had included in her summary and

---

[1]The bank statements were not admitted into evidence.

calculations medical expenses, 80% of which the father was already required to reimburse her for. When asked about the children's $1,195 monthly extracurricular-activity fees, the mother testified that A.B.S.'s show-choir fees were $2,000 per year, that S.K.S. had piano lessons costing $90 per month, and that L.E.S. played on a soccer team costing $1,000 per year and a volleyball team costing $600 per year.

Each of the children testified. A.B.S. testified that she was 16 years old. During A.B.S.'s testimony, the following exchange occurred between the father's counsel and A.B.S. about the visitation schedule:

> "A. Well, we go to my dad every Tuesday night. And then every other week our weekends swap. And then the weekends we're not with my dad we go to Sunday night dinner with him for a couple of hours.
>
> "Q. And do you go, what, Friday afternoon at five o'clock?
>
> "A. Five o'clock on Friday."

A.B.S. explained that she wanted to change the visitation schedule because it was difficult to "pack up everything and go see my dad for like one night. And then every other weekend, we have to pack up again." She said that she had talked with the mother and had told her:

> "A. At the beginning of summer, I like mentioned to my mom about maybe just trying some new things and like trying a week on and a week off possibly, or even like just adding

14

another night to my dad And we didn't really -- I didn't know what that would look like, I wanted to try to spend more time with my dad or make it easier where like we wouldn't have to go back and forth. And I think that's just what me -- and I'm not speaking for my sisters -- by all of us just kind of want is to not go back and forth as much."

A.B.S. testified that, after she had told the mother that she wanted to change the visitation schedule, the mother had told A.B.S. that she was hurt. She stated that the mother had not liked it when L.E.S. had chosen to stay with the father in July. A.B.S. said that both of her parents cared for her and were good parents. A.B.S. stated that she wanted to spend more time with the father.

M.C.S. testified that she preferred the current schedule. She testified that the current schedule was the easiest because it is their routine and she did not want it to change.

S.K.S. testified that she would like to keep the current schedule. She said that, like M.C.S., she was used to the schedule.

L.E.S. testified that she and her sisters were with the mother or the father every weekend and that they go to the father's house on Tuesdays to spend the night. She said that the sisters had dinner with the father on Sunday nights. L.E.S. testified that she wanted to spend more time with the father. L.E.S. explained that she had difficulty keeping in

15

contact with the father when she was at the mother's house because the mother would not let L.E.S. use her own cellular phone. During the questioning of L.E.S. by the father's counsel about whether the mother had agreed to L.E.S.'s spending additional time with the father last summer, the following exchange occurred:

"A. So I went to a camp and we were in the -- me and my sister were in the car and I had asked just about some more time with him. And she had gotten upset so she said that she didn't really care if I went to go live with him, so she said when she picked me up from that camp that afternoon it was my choice, so I chose to go home and when I got home to my mom's house, there was a bag full of like my stuff, all my clothes and toiletries and all that by the door. And then I called my dad and he came to pick me up. And then about like two weeks later I got a message telling me that I should come home which I was confused by because she said I had the choice but he would have to pay for everything.

"Q. Okay. She told you he would have to pay for everything if you didn't come home?

"A. I was registered for some camps, and he had to pay for the camps. And he had to pay for my school supplies and like re-register me for the camps, so he had to pay for it.

"Q. Now, when you got [to] her house when your stuff was packed up, did that upset you?

"A. Yes, sir. "

L.E.S. testified that she would like for visitation to be one week with the father and one week with the mother. L.E.S. testified that the mother is

16

a good mom but that she misses the father. She said that she loves her parents "the same."

On January 4, 2024, the father filed a motion to consider a posttrial material change of circumstances, alleging that the mother had remarried. On January 4, 2024, the mother filed a motion to strike the father's motion. On January 22, 2024, the father filed a response to the motion to strike. On February 23, 2024, the mother filed an emergency motion for an order directing the father to return A.B.S. The mother alleged that A.B.S. had left a school show-choir trip to go with the father and that the father had encouraged A.B.S. to disregard school policies and procedures. On February 26, 2024, the father filed a motion seeking an order directing the mother to return the father's name to the children's schools' "check in/out lists for the minor children," which the trial court had orally directed the mother to do during the trial. The father alleged that the show choir had been on a trip to Mississippi; that the father had provided the school with prior notice that he would pick up the child for a visit to a Mississippi college; and that, because the mother had not complied with the oral directive of the trial court to return the father's name to the children's schools' permission-to-check-out lists, the child

17

had been suspended from show choir.

On March 7, 2024, the mother filed a second emergency motion for the immediate return of A.B.S. On March 8, 2024, the trial court entered the following order:

"Upon consideration of [the father's] Motion to enter Order Regarding School Check-In/Out, the Court finds that the same is due to be granted. Further, the Court finds that the situation regarding the child being removed from show choir was the fault of [the mother] due to her failure or refusal to follow this Court's Order issued in open court in November of 2023 that she add [the father] to the check-in/check-out list at [the child's] school. Accordingly, it is hereby,

"ORDERED, ADJUDGED, and DECREED as follows:

"1. The [father's] Motion is GRANTED.

"2. If she has not done so already, [the mother] shall immediately add [the father's] name to the check-in/check-out list at every school where a child of the parties is in attendance. This Court hopes the oldest child's school will reconsider and not penalize the minor child by removing her from show choir for an issue that should not have existed but for [the mother's] lack of following an Order of this Court."

(Capitalization in original.)

On April 24, 2024, the mother filed a motion to set an in-person status hearing. On May 3, 2024, the mother filed a renewed motion to set an in-person status hearing. On May 10, 2024, the trial court entered an order setting all pending matters for a hearing on May 30, 2024. On June

18

20, 2024, the trial court denied the father's motion to consider a posttrial material change of circumstances. On July 17, 2024, the trial court denied the mother's motions for the immediate return of A.B.S.

On August 2, 2024, the trial court entered a final judgment, modifying the father's visitation schedule because the children, who were ages 9, 7, 6, and 4 at the time of the divorce, were now ages 17, 15, 14, and 12. The trial court found that the visitation schedule needed to be modified to reflect the current ages, activities and maturity levels of the children and because of the inability of the parents to agree on many significant matters. The trial court modified the father's visitation schedule so that, during the school year, the father would have visitation with the children every other weekend from Friday after school until "Wednesday morning return to school." As set out in the divorce judgment, the father would continue to have visitation with the children overnight on Tuesday during those weeks when the father did not have weekend visitation. The trial court awarded the father an additional three weeks of summer visitation so that each party had five weeks of summer vacation with the children, and the trial court awarded the father Christmas-vacation visitation from December 26 to the start of the

school year in January.

The trial court vacated its earlier order regarding the children's passports. The trial court found that any prior concerns of the mother that the father would abscond with the children were not supported by any evidence, and it determined that, considering that the passports had been obtained through the efforts of the father and at his expense and that the mother had not used the passports, the previous requirements regarding the father's use of the passports had proven to be cumbersome and at times unworkable given the parties' inability to cooperate on such matters.

The trial court's judgment further provided as follows:

"2. CHILD SUPPORT:

"(a) Child support is currently set at $2,000.00 per month. Evidence was presented through testimony and documents that the father is earning a significantly larger amount of money per year than when the parties entered into the Divorce Agreement, an increase of much more than ten percent. Furthermore, evidence was presented to show that the children's increased needs support a modification of child support. The father's income alone exceeds the upper limits of the Child Support Guidelines calculations of $30,000.00 per month, and the parties' combined monthly income exceeds that amount by more than $10,000.00. As such, the Court finds it is proper to set an amount of child support that exceeds the Child Support Guidelines' uppermost dollar

amounts, but not at the dollar amounts suggested by counsel for the mother.

"(b) Considering and allowing for other financial considerations set out herein, the Court ORDERS that the father shall pay the sum of $5,000.00 per month in child support. retroactive to the first full month after the original date of the filing of [the mother's] Answer and Counterclaim for Contempt and Modification of Child Support and Tax Exemptions, which will be October of 2021 (date of filing was September 16, 2021). This order and calculation thereon ($3,000.00 for 34 months) establishes arrears of $102,000.00. The [father] shall pay the arrears (added to the monthly child support amount) in equal payments of $1,325.00 each month for the next 77 months until the child support arrears are paid off in December of 2030, which coincides with the month the youngest child turns 19. The [father] shall make all child support payments the first (1st) day of each month hereafter, except that the payment for August of 2024 shall be due by August 7, 2024.

"(c) Monthly child support payments shall continue until each child reaches the age of 19, shall marry, die or otherwise become emancipated, consistent with the following paragraph.

"(d) The first month after the oldest child turns 19, the monthly child support amount shall decrease to $4,300.00 per month. The first month after the next oldest child turns 19, the monthly child support amount shall decrease to $3,600.00 per month. The first month after the next oldest child turns 19, the monthly child support amount shall decrease to $3,000.00 per month. The father's child support obligations shall terminate with the payment of the December 2030 payment.

"(e) With input from the mother, the father shall purchase dependable vehicles for his three youngest

daughters upon each reaching the age of sixteen. The father shall be responsible for the maintenance, insurance and upkeep for any vehicle driven by his daughters through the age of their majority, even if it means reimbursing the mother for sums paid for those expenses.

"3. All provisions of the Judgment and subsequent orders not modified herein shall remain in full force and effect.

"4. [The mother] shall make it clear to Auburn City Schools that [the father] has full authority to check the children in or out of school.

"5. The parties shall work together so that [the father] has the requisite information so that he may register for notifications from schools, extracurricular activities, and medical providers.

"....

"7. Both parties are found in contempt for interfering with visitation time, and violating both the letter and the spirit of the Court's prior Orders. Over the years, the Court recalls that the parties have almost never been able to voluntarily agree to adjust their situation to reflect the growth and changing needs of their children and the changing circumstances of each other. The parties have failed or refused to enter into good faith negotiations to amicably resolve matters and avoid having to litigate in court; and stubborn, selfish and contemptuous behavior by one or both parties has inevitably led to the filing of claims and counter-claims, Rule Nisi and contempt actions. Sadly, this behavior has, in the Court's opinion, resulted in the children beginning to take sides and not only using one parent against the other, but also using one or more siblings against the other(s) and a parent. Since this Court's last award of attorney fees against the father, the Court has been unable to keep a running score,

so to speak, and is unable to determine which party is the most in contempt. As such, the Court here declines to award either party attorney fees or costs for the contempts of the other.

"8. Neither party shall schedule a medical or counseling appointment for a child during the custodial time of the other, except by agreement or absolute medical necessity.

"9. Each parent is to enforce in his or her home the discipline imposed by the other in her or his home, especially as it relates to the types of discipline universally known to be most effective, such as the deprivation of driving privileges, dispossession of phones and/or electronic devices, and periods of being grounded in the home. Enforcing the dispossession of phones or electronic devices does not encompass prohibiting the child from using the parent's phone to maintain minimal but routine contact with the other parent.

"10. Neither party may block the other party on a child's phone, nor disable location services on a child's phone.

"11. The mother shall timely inform the father of any medical, academic or religious issues concerning the children, and inform the father of sports or other extracurricular activities involving the children which she may have reason to believe he is unaware.

"12. The father shall not travel to the mother's home for any reason other than to facilitate an exchange of the children, unless approved or requested by the mother.

"13. Any other relief requested by either party, not addressed herein, is hereby DENIED."

(Capitalization in original.)

On August 28, 2024, the father filed a motion to alter, amend, or

vacate the judgment, arguing that the evidence presented supported a custody modification awarding the parties' joint legal and physical custody; that the modification of child support was not supported by the evidence; that the trial court had erred in awarding retroactive child support; and that the trial court had erred in ordering the father to purchase automobiles for the children. On September 2, 2024, the mother filed a motion to alter, amend, or vacate the judgment, arguing, among other things, that the trial court had exceeded its discretion to essentially "back door" or "work around" Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), by substantially modifying the father's physical time with the children to almost equal physical time even though the father did not meet the necessary burden of proof under the McLendon standard. In addition, the mother argued that the visitation modification did not take into consideration the testimony of two of the four children, who each expressed a preference for maintaining the existing visitation schedule that had been in place for the past eight years.

On October 28, 2024, the father filed a motion to clarify regarding the renewal of the children's passports. On October 30, 2024, the trial court granted the motion to clarify. Both parties' postjudgment motions

24

were denied by operation of law.  See Rule 59.1, Ala. R. Civ P.  The father

filed a timely notice of appeal.

## Standard of Review

> "'"'"[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust."'" Water Works & Sanitary Sewer Bd. v. Parks, 977 So. 2d 440, 443 (Ala. 2007) (quoting Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005), quoting in turn Philpot v. State, 843 So. 2d 122, 125 (Ala. 2002)). "'The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'" Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)). "Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts." Waltman v. Rowell, 913 So. 2d at 1086.' "

Yarbrough v. Yarbrough, 184 So. 3d 1045, 1050 (Ala. Civ. App. 2015)

(quoting Retail Developers of Alabama, LLC v. East Gadsden Golf Club,

Inc., 985 So. 2d 924, 929 (Ala. 2007)).

## Discussion

## Custody

The father argues that the trial court erred in failing to award the

parties joint physical custody because, he says, sufficient evidence was

presented to support a modification under McLendon.  The father argues

that the trial court essentially agreed that there had been a material change in circumstances because the trial court substantially increased the father's visitation. The father argues that his visitation schedule is close to joint physical custody because, while the children are in school, the father has the children six nights of each two-week period and, during the remainder of the year, physical custody is approximately divided equally between the parties. The father argues that the mother had not followed the terms of the divorce judgment, that the mother had consistently interfered with the father's visitation rights, that the mother had disparaged the father to other parents to the detriment of the children, and that all four children had acknowledged that it was difficult to go back and forth between the parents for a day or an evening. The father argues that a joint-physical-custody arrangement would have little disruptive effect because the children would attend the same schools and church at either parent's residence.

> "In reviewing judgments involving determinations of child custody, 'the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.' Ex parte Bryowsky, 676 So. 2d 1322, 1326 (Ala. 1996). '[A]ppellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support

26

the trial court's judgment.' Cheek v. Dyess, 1 So. 3d 1025, 1029 (Ala. Civ. App. 2007)."

Crenshaw v. Crenshaw, 386 So. 3d 42, 51 (Ala. Civ. App. 2023).

To meet the McLendon standard, a noncustodial parent

"must prove to the satisfaction of the trial court (1) that the circumstances upon which the original judgment was based have changed, (2) that he or she is fit to act as a custodian for the child, and (3) that '"the positive good brought about by the modification ... more than offset[s] the inherently disruptive effect caused by uprooting the child."' Ex parte McLendon, 455 So. 2d 863, 865 (Ala. 1984) (quoting Wood v. Wood, 333 So. 2d 826, 828 (Ala. Civ. App. 1976))."

K.U. v. J.C., 196 So. 3d 265, 268 (Ala. Civ. App. 2015).

"'[M]odification of custody is not the proper remedy for a visitation dispute. ... "Rather, the appropriate remedy in such a situation is to punish the custodial parent for contempt, not to uproot the children."' Cochran v. Cochran, 5 So. 3d 1220, 1228-29 (Ala. 2008) (quoting Lami v. Lami, 564 So. 2d 969, 970 (Ala. Civ. App. 1989))."

E.K.C. v. D.L.G., [Ms. CL-2025-0231, Sept. 5, 2025] ___ So. 3d ___, ___ (Ala. Civ. App. 2025).

In the present case, we cannot say that the trial court exceeded its discretion in denying the father's request for joint physical custody. The father's primary argument for the modification was that joint physical custody would be convenient for the children. While all four children acknowledged difficulty in the former visitation schedule, the children

were split in their opinions on whether the former visitation schedule should be changed. The trial court granted the father's alternative request for increased visitation, which appears to alleviate the inconvenience caused by shorter visitation periods.

With regard to the father's argument that custody should be modified because the mother had not complied with the divorce judgment and the trial court had found that the mother had interfered with his visitation rights, we cannot say that the trial court erred. In L.M.J. v. J.I.J., 850 So. 2d 358 (Ala. Civ. App. 2002), this court acknowledged that, although the trial court's judgment did not indicate what standard it had applied to the request for a modification of custody, the trial court had indicated at a hearing in that case its apparent belief that a change of custody would be an appropriate sanction for contempt. 850 So. 2d at 362. This court concluded that,

> "[i]n light of the trial court's failure to indicate in its judgment that it applied [the standard for a modification of custody outlined in Ex parte] McLendon, [455 So. 2d 863 (Ala. 1984),] the trial court's comments, and the finding of contempt contained in the judgment, it appears that the trial court changed custody to the father as a sanction for the mother's continued contempt of the visitation provisions of the divorce judgment and subsequent in-court agreements to permit visitation ...."

28

Id. Moreover, this court noted that, in that case, the record did not contain sufficient evidence to support the conclusion that a change of custody would materially promote the child's best interests. Id. In the present case, the trial court found <u>both</u> parties in contempt for interfering with visitation time and violating both the letter and the spirit of its prior orders.

Child Support and the Purchase of Automobiles

The father argues that the trial court erred in modifying child support because, he says,

> "the evidence [the mother] presented regarding her request for the modification of child support was almost exclusively limited to the increase in the income of the parties.[8] No evidence was presented concerning the lifestyle of the parties or their children prior to the divorce. At best, the trial court was made aware of the parties' respective incomes at the time of the divorce, [the father] was employed and earning approximately $122,000.00 per year, and [the mother] was not employed outside of the home. … No testimony or other evidence was presented concerning the lifestyle to which the children were accustomed and the standard of living enjoyed before the parties were divorced.
>
> "[The mother] presented no testimony or other evidence, certainly not substantial evidence, of the reasonable and necessary needs of the children, an increase in those needs, or an increase in the reasonable and necessary expenses of the minor children. [The mother] offered her alleged average monthly expenses; however, the amount of said expenses and who paid the expenses was certainly called into question. …

29

[The mother] offered nothing to suggest her average monthly expenses or those of the children had increased since the Judgment. The trial court's finding that 'the costs of raising the children have increased,' ... appears to be more of a general statement, as no such evidence was presented.

"The one item that [the mother] might suggest could be evidence in support of her request was the allegation of the children's monthly activity expense being $1,195.00 per month; however, on cross examination, [the mother] provided no support for the alleged expenses. ... Even if the allegation of a monthly activity expense of $1,195.00 was supported by substantial evidence, and it is not, no evidence was presented to suggest that the monthly activity expense had increased.

_____

"[8]More specifically, the increase in [the father's] income. [The mother] all but ignored the increase in her own income. The trial court also ignored the increase in [the mother's] income...."

The father's brief at 36-38. The father also argues that the trial court's ordering him to purchase "dependable vehicles" for each child upon reaching the age of sixteen and to be responsible for insurance and maintenance on the vehicles was an abuse of discretion and not supported by the record.

It is undisputed that the parties' combined adjusted gross income exceeded the uppermost limit of the Rule 32, Ala. R. Jud. Admin., child-support guidelines. The mother was earning $60,000 a year, and the father had income of $550,000 in 2021 and $468,980 in 2022.

> "When the combined adjusted gross income exceeds the uppermost limit of the child support schedule, the amount of child support awarded must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce, <u>and</u> must reasonably relate to the obligor's ability to pay for those needs. [<u>Anonymous v. Anonymous</u>, 617 So. 2d 694, 697 (Ala. Civ. App. 1993).] To avoid a finding of an abuse of discretion on appeal, a trial court's judgment of child support must satisfy both prongs."

<u>Dyas v. Dyas</u>, 683 So. 2d 971, 973-74 (Ala. Civ. App. 1995) (footnote omitted).

> "[I]n determining whether to modify the father's child-support obligation and, if so, by how much, there were two factors the trial court was absolutely required to consider: (1) the reasonable and necessary needs of the children, taking into account the lifestyle to which the children were accustomed and the standard of living the children had enjoyed before the divorce, and (2) the father's ability to pay. <u>Ex parte Dyas</u>[, 683 So. 2d 974 (Ala. 1996)]. The trial court was free to consider other factors in exercising its discretion so long as it considered those two."

<u>Young v. Young</u>, 322 So. 3d 520, 525 (Ala. Civ. App. 2020) (plurality opinion).

In the present case, the trial court increased the father's child-support obligation from $2,000 to $5,000 because the father was earning a significantly larger amount of money per year than when the divorce judgment had been entered and "evidence was presented to to show that

31

the children's increased needs" supported a modification of child support. "A trial court exceeds its discretion when it increases a party's child-support obligation without any evidence to support that a material change has occurred." Broadway v. Broadway, 184 So. 3d 376, 386 (Ala. Civ. App. 2014). The mother, who sought the child-support modification, had the burden of proof. See Tolbert v. Tolbert, 260 So. 3d 45 (Ala. Civ. App. 2018). In addition to increased child support, the trial court also ordered the father to purchase, insure, and maintain cars for the children. See Bittick v. Bittick, 297 So. 3d 397 (Ala. Civ. App. 2019) (involving payment of the children's extracurricular activities and holding that, when the amount of the combined monthly income of the parents exceeds the uppermost limit of the child-support-guidelines schedule, the award of child support must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce, and must reasonably relate to the obligor parent's ability to pay for those needs). The trial court also ordered the father to reimburse the mother for sums she had paid for those car-related expenses.

In Prakash v. Pandey, 331 So. 3d 1158 (Ala. Civ. App. 2021), this court reversed a trial court's judgment ordering the husband in that case to pay child support plus additional expenses. This court found that the husband was not responsible for specific costs when no evidence of those costs was presented. This court explained:

"When the parents' combined monthly income exceeds the uppermost limit of the Rule 32[, Ala. R. Jud. Admin.,] child-support-guidelines schedule, the trial court must consider the reasonable and necessary needs of the children and the ability of the obligor parent to pay in making its child-support determination. See Bittick v. Bittick, 297 So. 3d 397, 402 (Ala. Civ. App. 2019); see also Ex parte Dyas, 683 So. 2d 974, 977 (Ala. 1996), aff'g, Dyas v. Dyas, 683 So. 2d 971 (Ala. Civ. App. 1995). '"The award of child support must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce ...."' Bittick, 297 So. 3d at 402 (quoting Brasfield v. Brasfield, 679 So. 2d 1091, 1094 (Ala. Civ. App. 1996)).

"According to the husband, the only evidence of the children's living expenses was the wife's testimony indicating that she had calculated her living expenses to be $22,000 per month, including 'mortgage, food, day care, extended care, clothing, laundry, telephone bill, internet bill, gas, electricity, cable, water, school lunches, medical psychiatric care, dental care, prescription drugs, auto insurance, and life insurance,' adding that she 'still [did not] have the numbers on medical insurance and car payment.' Based on other evidence submitted at trial, the monthly mortgage payment on the marital residence was $5,249.49; however, that house was to be sold pursuant to the amended divorce judgment, and the mortgage payments were to be made by the husband until the

sale of that residence. Also, the outstanding debt on the Mercedes, which the wife used to transport the children, was approximately $19,000, with a payment of $800 per month, and the husband likewise was responsible for that debt, in addition to his child-support obligation. Nevertheless, in considering the issue of child support, the trial court could consider the lifestyle to which the children were accustomed, see id., particularly, the fact that the marital residence was not to be the permanent residence for the children and the wife would have to obtain another residence for herself and the children. However, the record contains no discussion of where the wife and children might reside after they moved from the marital residence and contains little discussion of the specific needs of the children or the costs associated with their care beyond the son's day-care expense of $1,200 per month, which was scheduled to end in the fall of 2020 when he began kindergarten, statements that spending for the children's clothes was a few hundred dollars every few months, and a discussion of certain past-due amounts that were not discussed in terms of monthly costs. As noted, the husband was otherwise responsible for one-half of the children's extracurricular-activity expenses and for the payment of the children's health insurance, which was $550 per month, and the costs of the daughter's counseling, for which no evidence of cost was presented. Thus, those expenses may not be considered as part of the children's expenses included within the $7,050 child-support award. See Bittick, 297 So. 3d at 403 ('[I]n light of the fact that the judgment requires the father to pay 50% of such expenses, those expenses should be deducted from the mother's statement of the children's expenses.').

"Based on the foregoing, we agree with the husband that the evidence was insufficient to support a finding that the children required $7,050 from him -- in addition to the expenses of the children that the amended divorce judgment otherwise obligated him to pay -- for their reasonable and necessary needs. Accordingly, '"'we reverse the portion of the

34

> judgment setting an amount of child support and remand for further proceedings that will allow the court to determine the reasonable and necessary needs of the [children].'"' Tyson v. Tyson, 21 So. 3d 7, 10 (Ala. Civ. App. 2009) (quoting Burgett v. Burgett, 995 So. 2d 907, 914 (Ala. Civ. App. 2008), quoting in turn Elliott v. Elliott, 782 So. 2d 303, 306 (Ala. Civ. App. 1999), reversed on other grounds, 782 So. 2d 308 (Ala. 2000))."

Prakash, 331 So. 3d at 1168-70 (footnotes omitted).

The mother presented a document that contained a summary of her current monthly expenses to support her request for increased child support. Those expenses included a 4/5 portion of the mother's monthly expenses for automobile insurance, gasoline, utilities, pest control, a housekeeper, homeowner's association fees, the children's extracurricular activities, groceries, her saving for the purchase of automobiles, her mortgage payment, house maintenance, vacation expenses, entertainment, clothing, haircuts, and other incidentals. The mother included all of the oldest child's car-insurance and gasoline expenses. The mother also included all the counseling fees for the children along with the cost of their prescription medications as part of her monthly expenses.

We are unable to discern how the trial court determined the amount of the increase in child support or come to the conclusion that the father

should be required to purchase cars along with paying for car-related expenses. First, not all of the mother's claimed monthly expenses appear to be supported by the record. For example, the mother claimed that the children had expenses of $1,195 a month for extracurricular activities. When asked about the expenses, the mother stated that show-choir cost $2,000 a year, that soccer cost $1,000 a year, that volleyball cost $600 a year, and that piano lessons cost $90 a month, which amounts to $390 per month ($2,000 divided by 12 is $167; $1,000 divided by 12 is $83; and $600 divided by 12 is $50). Also, the mother included certain medical expenses as her expenses, but she admitted 80% of those expenses were to be reimbursed by the father under the divorce judgment. It does not appear that the trial court considered that the father, while paying $2,000 a month in child support, had also paid an additional $250 per month for the children's activities since the parties divorced in 2016. Second, it appears that some of the expenses the mother claimed in her child-support request regarding automobiles for the children duplicate the trial court's mandate that the father purchase, maintain, and insure cars for the children. Therefore, we reverse the portion of the judgment setting an amount of child support and requiring the father to purchase

36

automobiles and pay car-related expenses for the entry of a judgment that will allow this court to determine whether the trial court's award provides for the reasonable and necessary needs of the children.

Retroactive Child Support

The father argues that the trial court erred in awarding the mother retroactive child support because, he says, (1) the mother did not request retroactive support, (2) the father had provided support pursuant to the parties' agreement incorporated into the 2016 divorce judgment, (3) the mother presented no evidence concerning the children's needs or expenses during the period for which the retroactive child support was awarded, and (4) the mother did not present evidence indicating that the children were not "provided for" during the period for which the retroactive child support was awarded.

In Brown v. Brown, 719 So. 2d 228 (Ala. Civ. App. 1998), a divorce action, the trial court ordered the husband in that case to pay child support and a child-support arrearage of $7,500. Although the trial court had never entered a pendente lite child-support order in the case, it was undisputed that the husband had voluntarily paid $100 per week in child support during the first year after the parties separated in June 1995.

The husband paid no child support from June 1996 until the divorce judgment was entered in July 1997. The husband argued that the trial court had erred in awarding the wife a $7,500 "arrearage" in child support for the period of June 1996 to July 1997 when the trial court had never entered a pendente lite child-support order. The husband also argued that the arrearage award was arbitrary and without support in the record. This court disagreed, writing:

> "In cases seeking modification of child support, it is within the discretion of the trial court to make any modification retroactive to the date of the filing of the petition for the modification. State ex rel. Nathan v. Nathan, 680 So. 2d 339 (Ala. Civ. App. 1996); Rogers v. Sims, 671 So. 2d 714 (Ala. Civ. App. 1995); State ex rel. Dunnavant v. Dunnavant, 668 So. 2d 851 (Ala. Civ. App. 1995). In cases that involve an award of post-minority support for a college eduction, this court has held that the award of such support will be retroactive to the date of the filing of the petition for the support. Thompson v. Thompson, 689 So. 2d 885 (Ala. Civ. App. 1997) (citing Bayliss v. Bayliss, 575 So. 2d 1117 (Ala. Civ. App. 1990)). In Thompson, this court quoted a Pennsylvania court and concluded that: 'There is a sound policy favoring retroactivity in most cases, because the party entitled to support should not be penalized for having to resort to time-consuming court proceedings.' 689 So. 2d at 889 (citation omitted). Finally, the Alabama legislature recognized the parent's duty to support a child and created a cause of action for retroactive support. See §§ 30-3-110 et seq., Ala. Code 1975.
>
> "Given this state's policy and law requiring a parent to support a minor child, we hold that a trial court may, in its

discretion, award child support retroactive to the filing of the complaint for divorce where the trial court has failed to enter a pendente lite child support order for the period in which the parent had a duty to support the child but failed to provide that support. <u>In future cases, when awarding retroactive support, the trial court should state its reasons for the award, the factors it considered, and the manner in which it calculated the retroactive support award</u>.

"We emphasize that this holding is not meant to eliminate the use of pendente lite orders for temporary child support during the pendency of divorce proceedings. Parents have a duty to support their minor children; the trial courts should rule on a request for temporary child support as expeditiously as possible."

<u>Brown</u>, 719 So. 2d at 232 (emphasis added). "The determination whether an award of retroactive child support is appropriate is dependent on the specific facts of the case." <u>Willis v. Willis</u>, 45 So. 3d 347, 349 (Ala. Civ. App. 2010).

In <u>S.A.M. v. M.H.W.</u>, 227 So. 3d 1232 (Ala. Civ. App. 2017), the father in that case contended on appeal that the mother's request for retroactive child support had been, in fact, an amendment to her counterclaim for which she had not properly sought leave under Rule 15(a), Ala. R. Civ. P. This court held that the issue was properly before us, explaining:

"The father might be correct that the mother's motion seeking retroactive child support should have been presented not by

motion but by an amendment to her counterclaim. See Walker v. Walker, 695 So. 2d 58, 60 (Ala. Civ. App. 1997) (concluding that a request for retroactive child support was a compulsory counterclaim to a divorce complaint). He is correct that any amendment to the mother's counterclaim would have required leave of court because the case had been first set for trial in January 2016. See Rule 15(a)[, Ala. R. Civ. P.] (stating that 'a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause,' if an amendment is made less than 42 days before the initial setting of the case for trial); see also Austin v. Austin, 159 So. 3d 753, 758 (Ala. Civ. App. 2013) (quoting Image Mktg., Inc. v. Florence Television, L.L.C., 884 So. 2d 822, 826 (Ala. 2003), quoting in turn Hoover v. Blue Cross & Blue Shield of Alabama, 855 F.2d 1538, 1544 (11th Cir. 1988)) (emphasis omitted) (indicating that, in most cases, an amendment filed without leave of court is '"'without legal effect'"'). However, we cannot agree with the father that the issue of retroactive child support was not properly before the juvenile court. The issue of retroactive child support was raised at trial without objection, and, therefore, even if not properly pleaded, it was tried by the implied consent of the parties. See Rule 15(b), Ala. R. Civ. P."

S.A.M., 227 So. 3d at 1233.

In the present case, the mother did not request retroactive child support in her counterclaim or amended counterclaim. The issue of retroactive child support was not addressed during the trial. At trial, the mother asked for an increase in child support based on her monthly expenses. There was no testimony that the children were not provided for while her request for an increase in child support was pending. The

40

testimony regarding the mother's expenses was not sufficient to indicate that the issue of retroactivity was tried by implied consent. Accordingly, the trial court erred in awarding retroactive child support.

## Conclusion

The judgment of the trial court is affirmed with respect to its determination regarding the father's request for a custody modification. The judgment is reversed with respect to the award of child support, the requirement that the father purchase automobiles for the children, and the award of retroactive child support, and the cause is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Edwards and Bowden, JJ., concur.

Moore, P.J., concurs in the result, without opinion.

Fridy, J., recuses himself.